PHILLIP McANANY, by Next Friend, MARY McANANY, Appellant, v. WILLIAM C. HENRICI and CHARLES P. SHIPLEY.

Division One, November 29, 1911.

1. **NEGLIGENCE: Falling Board from House: Injury to Pedestrian: Expert Opinion of Defect.** A piece of crown molding fell from a wooden house, and struck a pedestrian passing on the sidewalk. Three expert witneses testified that, from the appearance of the molding and the nails which had held it in place, it must have been loose and insecure for a period of several months, if not years; that for a period of about two years there must have been a crack or opening of not less than one-eighth of an inch between the molding and the parts of the building to which it had been nailed; and that the crack must have been large enough to have attracted the attention of the owner and his tenant had they exercised ordinary care to discover it. *Held*, that the testimony was incompetent for two reasons: first, because the matters and things testified to by the experts were not proper subjects of expert testimony; and, because, an opinion of an expert cannot be based upon an opinion.

2. ——: ——: **Expert Testimony.** Expert testimony is not admissible unless it is clear that the jurors themselves, for want of experience or knowledge of the subject, are incapable of drawing correct conclusions from the facts proven.

3. **EXPERT TESTIMONY: What Is.** Expert testimony is the opinion of a witness possessing peculiar knowledge, wisdom, skill or information regarding a subject-matter under consideration, acquired by study, investigation, observation, practice or experience, and not likely to be possessed by the ordinary layman or an inexperienced person who is incapable of understanding the subject under consideration without the aid of the opinion of some other person who possesses special knowledge, wisdom, skill or experience.

McAnany v. Henrici.

4. ———: **Facts to Which Expert May Testify.** An expert witness cannot, by his opinion, establish that a crack existed between the molding, which fell and struck a passing pedestrian, and the walls or eaves to which it had once been nailed, nor that the crack must have been of not less than an eighth of an inch wide, nor that it must have existed for months or years prior to the time the molding fell. But those facts having been established by eye-witnesses, the expert may give it as his opinion that those conditions indicated to their minds looseness and insecurity in the molding.

5. ———: **Opinion Upon Opinion.** All expert testimony must be predicated upon facts or conditions conceded to be true or existing, or assumed to be established by other testimony; and that necessarily excludes the possibility of basing one opinion upon another opinion.

Appeal from Jackson Circuit Court.—*Hon. Charles R. Pence*, Special Judge.

AFFIRMED.

*Guthrie, Gamble & Street, Boyle & Howell* and *A. F. Smith* for appellant.

(1) Plaintiff was entitled to go to the jury under the doctrine of *res ipsa loquitur.* Roberts v. Mitchell. 21 Ont. App. Rep. 433; Clare v. Bank, 1 Sweeney, 539; Mullen v. St. John, 57 N. Y. 551; Barnowski v. Nelson, 89° Mich. 523; Railroad v. Hopkins, 12 L. R. A. 189, and note; Vincett v. Cook, 4 Hun, 318; Burne v. Broadle, 2 Hurlst. & C. 722; Scott v. Dock Co., 3 Hurlst. & C. 596; Kerney v. R. F., L. R. 5 Q. B. 411; L. R. 6 Q. B. 759; Smethurst v. Church, 148 Mass. 261; Howser v. Railroad, 80 Md. 96; Ryder v. Kinser, 65 Minn. 85; Volmar v. Rylo, 134 N. Y. 418; Favers v. Munay, 84 N. Y. S. 558; Lubelsky v. Silverman, 96 N. Y. 1056. (2) Expert testimony is not controlling, but only in aid of the jury. Hall v. City, 138 Mo. 618. (3) The testimony of the experts was competent as expert testimony in aid of the jury. Boetter v. Iron Co., 124 Mo. 104; Combs v. Const. Co., 205 Mo. 389; Egan v. Dry Dock Co., 12 N. Y. Sup. Ct. App. Div. 568; Turn-

pike Co. v. Case, 80 Md. 36; Cook v. Castner, 63 Mass. (9 Cush.) 266; Morgan v. County, 92 Iowa, 646; Bush v. Railroad, 166 N. Y. 216; Hand v. Brooklyne, 126 Mass. 324; Cate v. Frank, 112 Cal. 613; Ferguson v. County, 57 Iowa, 604; Taylor v. Towne, 43 Conn. 36; McConnell v. City, 80 Iowa, 295; Carr v. Railroad, 92 Hun, 74; Caven v. Bodwell, 97 Me. 381; City v. Humers, 33 Ark. 116; Sneda v. Libera, 65 Me. 343; Tremblay v. Mapes, 169 Mass. 284; Insurance Co. v. Pruitt, 75 Ind. 125; Stanwick v. Butler, 93 Wis. 430; Smith v. Guguerty, 4 Barb. 625; Bettys v. Township, 115 Mich. 228; Snyder v. Mfg. Co., 134 Ga. 324. (4) The testimony of the experts was competent, even if it was not a case for expert testimony, as an opinion upon a complexity of facts which could not be so intelligently and satisfactorily explained to the jury as to enable the jury to form an opinion as well as the witness observing the facts. 5 Ency. Ev. 520; 12 Am. and Eng. Ency. Law (2 Ed.), 422; Eyerman v. Sheehan, 52 Mo. 221; Const. Co. v. O'Brien, 81 Mo. App. 639; State v. Patrick, 107 Mo. 175

*Sebree, Conrad & Wendorff* for respondents.

(1) Though the ground specified in the order sustaining the motion for a new trial may not justify the order, yet if the record in the case shows that there was error committed in the course of the trial not so specified that did justify it, the action of the court will be sustained. Miller v. Madison Car Co., 130 Mo. 517; Crawford v. Stock Yards Co., 215 Mo. 402. (2) The court erred in the giving of plaintiff's instruction number one. (3) The verdict is so excessive as to manifest bias and prejudice on the part of the jury. (4) The court erred in refusing the instruction of the respondent Henrici in the nature of a demurrer to the evidence. Frankie v. City of St. Louis, 110 Mo. 516; Whiteley v. McLaughlin, 183 Mo. 160; Coates v. Merri-

wether, 144 Mo. App. 89; Reinhardt v. Holmes, 143 Mo. App. 212; Pope v. Boyle, 98 Mo. 527; McCord v. St. Joseph Water Co., 181 Mo. 692; Braddelley v. Shea, 33 L. R. A. 47; Wilcox v. Hines, 100 Tenn. 524; Timlin v. Standard Oil Co., 129 N. Y. 314; Monroe v. Carlyle, 176 Mass. 199; Ward v. Hinkleman, 37 Wash. 365; Tully v. Railroad, 134 Mass. 503; Rigg v. Boston Beach Bridge Co., 158 Mass. 314. (5) The court was right in granting a new trial on the ground that it erred in admitting expert testimony offered by the plaintiff. Wigmore on Evidence, secs. 1918, 1928; Lee v. Publishers, 155 Mo. 616; Benjamin v. Railroad, 133 Mo. 289; Gutridge v. Railroad, 94 Mo. 468; Dammann v. City of St. Louis, 152 Mo. 186; Morgan v. Mfg. Co., 120 Mo. App. 590; Rossier v. Railroad, 125 Mo. App. 159; Graney v. Railroad, 157 Mo. 666; Breen v. Cooperage Co., 50 Mo. App. 213; McGrath v. Company, 197 Mo. 104; Leonard v. Storage Co., 121 Mo. App. 105; Smart v. Kansas City, 91 Mo. App. 592.

WOODSON, J.—The plaintiff, on July 3, 1905, while walking along one of the principal streets of Kansas City, was struck on the head and seriously injured by the falling of a board, known as "crown molding," which had blown from a certain building presently to be described, belonging to the defendant Henrici, and occupied by defendant Shipley as his tenant. Suit was brought by the plaintiff against both of said parties to recover $15,000, damages for the personal injuries sustained, which it is claimed were caused by the negligence of the defendants. A trial was had which resulted in a verdict and judgment for the plaintiff, for the sum of $10,000. A motion for a new trial and in arrest of judgment were filed, which were by the court sustained, for the reason, assigned by the court, that it had erred in admitting certain expert testimony. From the order of the court granting the new trial, the plaintiff duly appealed the cause to this court.

The facts of the case are few, simple and practically undisputed, which are as follows:

For some time prior to the year 1903, the respondent Henrici was the owner of the building in question, located at No. 1413 Genesee street, Kansas City, Missouri, which was a frame structure, one story in height, and was about twenty-three or four years old, and had been used as a church, but subsequently by respondent Shipley for storage purposes. After the Missouri River flood of the summer of 1903, the defendant Henrici had the building repaired and repainted all over, by a firm of contractors, known as the Pelletier Construction Company, of that city. The building was located in the flood district, and for that reason the repairing before mentioned became necessary, but the crown molding previously mentioned was not affected by the waters. But the employees of the construction company testified that in repairing the building they made a thorough inspection of the entire structure, including the crown molding, and wherever they found a board off, or loose, they replaced it, and renailed all loose boards and timbers.

The painters who did the painting (two coats) for the contractors, also testified that while doing the painting they inspected and painted the entire building, including the crown molding.

Also the respondent Henrici testified that prior to the time when the repairing was done, with that object in view, he made a thorough inspection of the entire structure, crown molding included, and ascertained what repairs were necessary, and then employed said contracting company to do the work; and that after the work was completed, he again inspected it, to see if the work had been done according to contract.

Shipley, the other respondent, testified that at the time he rented the building, and frequently thereafter, he made careful inspections of the building.

After thus familiarizing themselves with the condition of the building, all the parties mentioned testified that they never saw or detected that the crown molding was loose, or otherwise in a defective or dangerous condition, prior to the time of the injury, and thought they would have seen it if any such condition existed.

Several disinterested witnesses, who had frequently passed the building during the previous years, testified that they had, in the ordinary way, while passing, observed the building and had seen no defects about it, and that they saw nothing which indicated anything to the contrary.

The testimony for the appellant was to the effect that the building, as previously stated, was an ordinary, one-story frame building, fronting west, with what is known as a gable front. The highest point of the roof, which was in the center of the building, was not shown, but it sloped equally in both directions, presenting a front in the shape of the letter V inverted. The building stood close to the property line, and the sidewalk ran along the front thereof. That prior to the time Henrici had the building repaired there were many loose weather-boards scattered all over the same, most of which were nailed back, while others were moved and were replaced with new ones. That these boards had become loose, because the nails which had held them rusted in two, probably caused by the waters of the flood. On the day of the accident the wind was quite high, but not more than what might have been expected in that climate.

I copy the following almost literally from the statement of the case, made by counsel for appellant, which the evidence tends to support, viz.:

"While plaintiff was on some errand, one of the crown moldings, descending from the top of the roof in the center on the south side to the lowest point of the eaves on that side, fell and struck him. The length

of the board was about 14 feet. This crown molding on buildings is a part of the finish or decoration and does not serve any direct useful purpose. The edge of the roof extends over the building and is referred to in the testimony as the 'eaves.' Back from the outer lines of the eaves and perpendicular from and at right angles with the eaves is the 'facia.' The crown molding stands at an angle of about forty-five degrees from the edge of the eaves downward and inward to the facia, and necessarily has beveled edges at both places of contact, and is held in place by nails driven through the crown molding into the eaves on one side and the facia on the other. This particular piece of molding was nailed, in the opinion of experts, based on an examination of the remnants, with cut steel nails. Cut steel nails differ from wire nails in their form in this, that the cut steel nail tapers from the head to the point and the point itself is blunt. The wire nail is round and equal in diameter its entire length except at the extreme end where it sharply tapers down to a small point. These nails differ in their effect upon the fibre of the wood into which they are driven and in their holding qualities in this, that the blunt head of the cut steel nail crushes the wood and breaks and destroys the fibre as it is driven in, so that, the fibre being broken, the wood does not close with the tendency to compression around the nail as is the case with a wire nail, where the fine point simply spreads the fibre and leaves it unbroken to close tightly around the nail. When a cut steel nail begins to rust away, the fibre does not hold it so tightly and increasing quantities of moisture may enter, and, as the fibre does not shrink up around the tapering nail, there is a tendency to loosen and let the wood slip along it in whatever direction pressure or gravity tends to draw it, thereby exposing part of the nail freely to the weather and leaving it loose in the wood. With the wire nail of equal thickness substantially its entire

length and with the fibre spread instead of broken, this tendency to rapidity in the deterioration of the nail itself and the looseness of the board on the deteriorated nail does not exist in the same degree.

"The pieces of crown molding on this front were not mitered at the top but met with a square joint, so that either piece of molding in place would hold the other piece in place even though the nails were insufficient in themselves for that purpose, until vibration of the building or a good wind from the right direction shook it loose.

"A young man passing this place on the morning of the accident saw the lower end of this crown molding flapping backward and forward some inches in the wind. Again passing about the middle of the afternoon he found the plaintiff stretched on the sidewalk bleeding from the wound, the piece of molding with blood on it lying on the sidewalk beside him, and the molding gone from the place where he had seen it working in the wind in the morning. He identified the piece produced at the trial as the piece he had seen on the sidewalk, and testified that at the first trial it was in the condition he had then seen it, but had lost a considerable portion of the rusty nails then in it, either by their dropping out altogether or being broken off.

"Along what was the lower edge of this crown molding when in place were irregular splotches of paint mixed with dirt and extending in to the inner or out-of-sight side of the molding a considerable distance, built up in places to a protuberance or splotch of a quarter of an inch. There was also a smear of tar on the back or inner surface of the molding near its center. In the repairs made by Henrici in 1903 the building had been repainted and the roof retarred."

The foregoing statement of the physical condition of the building and the materials of which it was constructed, made by counsel for appellant and the writer,

is as strong or stronger in his favor than the evidence preserved in this record warrants.

In addition to the foregoing evidence, the appellant, over the objection and exceptions of counsel for respondents, offered three expert witnesses, who after qualifying as such, were permitted to testify, that from an examination made by them of the crown molding which fell from the building and injured the appellant, and the nails with which it had been fastened to the building, it must have been in a loose and insecure condition for a period of several months, and probably years antedating the date of the letting of the building by Henrici to Shipley; also that at the time Henrici leased the building to Shipley, and for a period of twenty months or more before the accident, there must have been a crack or an opening between the crown molding and the parts of the building to which it was attached of such dimensions that it could have been seen by Henrici and Shipley, by the exercise of ordinary care, in time to have repaired the same, and thereby have prevented the injury.

The court granted a new trial in this cause, for the reason that it had erred in admitting the expert testimony previously mentioned.

This is the salient point in this case, and if that testimony was erroneously admitted, and should not be considered for that reason, then clearly there was no case made for the jury. Even counsel for appellant, without that evidence, recognizes the fact that there is an entire absence of proof tending to show that there was any defect in the building at or about the crown molding mentioned, or that there was any evidence or manifestation of any insecurity in that regard, or that there was anything about the molding which would have enabled a detection thereof upon inspection. But seeking to bridge this otherwise impassable gulf separating appellant from a right of recovery, counsel called three expert witnesses who

testified in substance that, from the appearance of the molding and the nails which had held it in place, the molding must have been loose and insecure for a period of several months, if not years antedating the date of the leasing of the premises by Henrici to Shipley; that for a period of about two years prior to the date of the accident, there must have been a crack or opening of not less than one-eighth of an inch between the crown molding and the parts of the building to which it had been attached by means of nails; and that the crack must have been sufficiently large and apparent to have attracted the attention of the respondents had they exercised ordinary care in that regard. In other words, the experts did not testify that there was in fact a crack there, but it was their opinion, based upon the evidence previously mentioned, that a crack must have existed there of such dimensions and for a sufficient length of time to have enabled both of the respondents to have discovered the defective condition of the molding had they exercised ordinary care in that regard.

Clearly this testimony was incompetent for two reasons: first, because the matters and things testified to by the experts were not proper subjects of expert testimony; and, second, because an opinion of an expert cannot be based upon an opinion, any more than one presumption can be predicated upon another presumption.

We will briefly consider these two propositions in the order stated.

(a) The outward physical condition of the molding and the nails which had held it in position, could have been seen and understood just as well by the jury as it was seen and understood by the experts; and likewise, they were just as competent to describe the molding, the building, the fastenings, and the cracks, if any there existed, as well as the general physical appearance thereof, as were the experts who testified

in that regard. Yes, much better, for they would have testified from observation, while the experts would only have given their opinions.

Such things, almost daily, fall under the observation of the ordinary citizen, and there was nothing in the appearance thereof which could not have been seen and as readily understood by him, as could have been done by an expert who never saw it.

That being unquestionably true, then the testimony of the expert witnesses should have been excluded, for the rule is firmly established in this State and elsewhere that expert testimony is not admissible unless it is clear that the jurors themselves, for want of experience or knowledge of the subject, are incapable of drawing correct conclusions from the facts proven. And it necessarily follows that if the ordinary witness and citizen can understand such matters, then the juror who is selected from the latter, must also be capable of understanding them. [Benjamin v. Street Railway Co., 133 Mo. 1. c. 289; Gregory v. Chambers, 78 Mo. 294; Hurt v. Railroad, 94 Mo. 255; Railroad v. Union Stock Yards Co., 120 Mo. 541.]

The proposition discussed in this paragraph, will be further considered in connection with the second proposition mentioned, because of their close relation.

(b) In the consideration of the second proposition previously mentioned it might be well to understand what expert testimony really is.

That term has been so frequently defined by this court and the various courts of appeals, in numerous decisions, it becomes unnecessary for us to seek learning elsewhere upon that subject. The substance of those decisions may be stated as follows:

Expert testimony is the opinion of a witness possessing peculiar knowledge, wisdom, skill or information regarding a subject-matter under consideration, acquired by study, investigation, observation,

238 Sup.—8

practice or experience, and not likely to be possessed by the ordinary layman or an inexperienced person, and consequently who is incapable of understanding the subject under consideration, without aid of the opinion of some person who possesses such knowledge, wisdom, skill, practice or experience; and a person who is competent to give expert testimony is denominated as "expert witness." [See cases previously cited; also Benjamin v. Railway, 50 Mo. App. 602; Riley v. Sparks, 52 Mo. App. 572; Bradford v. Railway, 64 Mo. App. 475; Turner v. Haar, 114 Mo. 335; Goins v. Railway, 47 Mo. App. 173; Helfenstein v. Medart, 136 Mo. 595; State v. Wisdom, 84 Mo. 177.]

Now by recalling the evidence in this case, it will be remembered that outside of the expert testimony there was no pretense whatever made that there was in fact a crack or opening between the place of molding, which fell and injured the appellant, and the wall of the building, or the eaves of the roof, but it was the mere opinion of the expert witness, first, that a crack must have been there of not less than one-eighth of an inch in width, and, second, that it must have existed for some months or years prior to the date Henrici leased the building to Shipley down to the date of the unfortunate accident; and, third, that those conditions indicated to their minds looseness and insecurity of the molding in question.

(In order to avoid confusion, it will here be conceded, that if the first two conditions just mentioned had been established by eye witnesses, speaking from their own knowledge, then the third condition predicated thereon might very properly have been proven by the testimony of expert witnesses.)

From that condition it is argued that the law imposed the duty upon the respondents to have discovered the loose and insecure condition of the molding, and that, too, in time to have prevented the injury.

In passing, I desire to state that, in my opinion, in order to reach the conclusion thus stated by learned counsel for appellant, they must necessarily occupy inconsistent and contradictory positions in the case, namely: They in the first place contend that it was necessary, and that the nature of the case required the testimony of expert witnesses, not only to show that the crack mentioned actually existed, but also that it could have been seen by respondent, and that, too, in time to have warned them of the loose and insecure condition of the molding. Now if that is true, then by what process or reasoning can it be logically contended that the respondents, who were not experts, could or should have been required to have discovered the loose and insecure condition of the molding? If it required the testimony of expert witnesses to establish the fact that a crack of the character mentioned actually existed, then it seems to me indisputably true that it would have required an expert to have seen it; if in reality it did exist.

Nor is it any answer to this suggestion for counsel for appellant to make the counter suggestion that they were unable to find any witnesses who actually saw the crack, and who could testify of their own knowledge to its existence, for the simple reason that the inability of a party litigant to procure competent witnesses by whom to establish the facts of his case, by no means authorizes him to revert to incompetent witnesses to prove these facts.

Suppose, for instance, counsel for appellant could have produced eye witnesses who saw the crack or opening, then unquestionably they would have been competent to have testified to that fact. So say all the authorities; and if that be true, which unquestionably it is, then, it is because it is a proper subject of proof by laymen and non-expert witnesses, and did not require the peculiar knowledge of an expert to explain the subject under consideration. So by the

last analysis, the proposition stated in paragraph (a) of this opinion, must be true, namely, that the subject under consideration was not a proper matter for explanation by expert testimony.

But returning to the subject we had in hand prior to the digression caused by the foregoing passing remarks, namely: Is it proper to predicate one expert opinion upon another? Counsel for appellant contend for the affirmative, while counsel for respondents deny that proposition.

Preliminary to my observations upon this question, I desire to state that the rule which requires all expert testimony to be predicated upon facts or conditions conceded to be true or existing, or assumed to be such in the hypothetical question propounded to the expert, is as old as our jurisprudence, and is as unbending as were the laws of the Meeds and Persians, which, in my opinion, would exclude the right to base one opinion upon another, and this case is no exception to that rule.

Counsel for appellant cite, and rely chiefly upon the cases of Boettger v. Iron Co., 124 Mo. l. c. 104, and Combs v. Construction Co., 205 Mo. l. c. 389, in support of their contention. In the first case, this court held that it was proper to show by expert testimony what effect a knot or crossgrain in a stick of timber used in a scaffold, mentioned in the opinion, would have upon its strength. And in the last case, it was held that it was proper to permit an expert to testify that a certain number of nails of a given size were necessary to make certain cleats mentioned withstand the service to which they were subjected.

. There can be no question but what the ruling in both of those cases was correct, but they fall far short in sustaining the position here advanced by counsel for appellant. If the opinion, for instance, in the first case, had gone one step further, and had held that it was not only proper to show by expert testimony what

effect the knot and crossgrain in said stick of timber had upon its strength, but that it was proper also to show by the same character of testimony that the knot and crossgrain mentioned actually existed, then that case would have been parallel to the case at bar. But instead of showing the existence of the knot and crossgrain in that case by the opinions of or the testimony of expert witnesses, their existence was established by eye witnesses, who testified from their own knowledge of their existence. But if the attempt there had been the same as it was here, namely, to show in the first instance, by expert testimony, that the knot and crossgrain mentioned must have existed in point of fact; and, second, that in their opinions the existence of the knot weakened the timber and caused it to break, doubtless quite a different ruling would have been announced in that case.

So in the case at bar; when counsel for appellant attempted to show by expert testimony, first, that there must have existed a crack or opening between the molding and the parts of the building to which it had been fastened, and, second, that said crack or opening weakened, or was evidence of the weakened condition of the molding, or the fastenings of the molding, they offered to do that which is not authorized by the law of evidence.

The same observations apply equally well in the second case relied upon by counsel for appellant. There the existence of the cleats and their purpose were shown by the testimony of eye witnesses, and the court very properly admitted expert testimony to show what number of nails were necessary to make them secure, etc.; but it would have been error if the court had permitted counsel in that case to have shown by expert witnesses that, in their opinions, such nails were not only necessary, but also to have shown in the first place that, in their opinions, such cleats in fact

existed, and, second, what nails were necessary to hold them in place.

We are, therefore, of the opinion that the court erred in admitting the expert testimony mentioned, and consequently we are also of the opinion that the court properly granted respondents a new trial for that reason.

We therefore affirm the judgment of the court, granting a new trial. All concur.