CITIZENS BANK OF FESTUS, a Corporation, Plaintiff, Appellant,

v.

MISSOURI NATURAL GAS COMPANY, a Corporation, Defendant, Respondent.

No. 46153.

Supreme Court of Missouri.

Division No. 1.

June 9, 1958.

Motion for Rehearing or to Transfer to Court En Banc Denied July 14, 1958.

Dearing, Richeson & Weier, Samuel Richeson, Hillsboro, Willson, Cunningham & McClellan, Richard D. Gunn, St. Louis, for appellant.

Charles F. Hamilton, Morris E. Stokes, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Hamilton, St. Louis, for respondent.

HYDE, Judge.

■ Action for $150,000 damages to plaintiff's building by fire claimed to have been caused by negligence of defendant. Verdict and judgment were for defendant and plaintiff has appealed. Plaintiff alleges trial errors and defendant claims that plaintiff failed to make a case for the jury. We will, therefore, state the facts shown by the evidence from the view most favorable to plaintiff.

Plaintiff alleged that a gas heating unit installed and serviced by defendant was defective and produced heat of such temperature as to cause the building to catch fire. Defendant's theory was that the fire started under the floor of the second story from the electrical wiring to the east of the heating unit and burned under the floor until it reached the room in which the heating unit was located. There was much electrical equipment in the dentists' offices with wiring for it under the floor.

Plaintiff's two story brick building was located at the northwest corner of Main and Adams Street in Festus. Two dentists, Dr. Lea and Dr. Reed, had offices on the second floor. Each had a reception room, a business office room, a laboratory room, a darkroom, and two operating rooms. The floors of these rooms were covered with tile on plywood. Dr. Lea's offices were in the south part of the second floor and Dr. Reed's in the north part. In 1954, defendant installed for plaintiff a combination gas operated heating and cooling unit for these second floor offices. It was placed in a small room between the offices of the dentists. This room had only tongue and groove wooden flooring without any plywood or tile over it. The unit was mounted on a wooden platform and it was housed in a metal cabinet. An enclosure of plaster board and wooden studding was built around it, having a wooden door with louvers at the bottom for cold air return. The piping, controls, and enclosure was designed and installed by defendant. Metal ducts led from the top of the unit to all rooms of the dentists' offices. The only thermostat was on the west wall of Dr. Lea's north operating room. Dr. Reed had access to it through a door between the two offices and he would turn it down to a 65 degree setting when he left in the afternoon. (The thermostat could be set from 65 to 90 degrees.) The furnace did not heat satisfactorily and many complaints were made to defendant; it was either too hot or too cold and 40 reports of service calls by defendant's employees were in evidence. (Some of the complaints were because of difference of temperature in the various rooms.) The fire occurred on Sunday, January 22, 1956; and during that month the temperature was frequently 10 to 15 degrees above the thermostat setting.

Three weeks before the fire two of defendant's employees changed some gas valves on the furnace. On the Thursday before the fire (Jan. 19) the heat was excessive and upon complaint being made, an employee of defendant came and worked on the furnace. Nevertheless, it was very warm both on Friday and Saturday with the thermostat set at 65 degrees. Dr. Lea went to his office on Sunday morning, January 22, at 9:00 to 9:15. He and an attorney, Albert Ennis, entered the building together, with Dr. Lea's patients, Mr. and Mrs. William Hardin. They entered Dr. Lea's office and Mrs. Hardin complained of the heat. Dr. Lea examined the thermostat and it was set for 65 degrees; but he said the temperature was over 80 degrees and he made no adjustment or change. Another patient came in while Hardin was in Dr. Lea's chair, and after he treated both patients they all left about 9:30 a.m. Nothing attracted Dr. Lea's attention at that time except that it was very warm. There was no fire or flame of any kind in his office when he left. He went to his home and heard the fire siren about 10:00 to 10:15 a.m. When he got down to his office it was on fire, but no water had yet been put on it by the fire department. After the fire had been put out, Dr. Lea went to his office and observed the furnace unit and the

burned condition of the building. There was a hole burned through the roof above the unit which was larger than the unit and there was a hole burned through the floor of the second story, in front of the furnace unit. The wall was burned out on the left side of the small room enclosing the furnace and all the furniture of his reception room (adjoining the furnace room on the west) was completely burned. The metal door on the heating unit was bent out a foot or more at the upper right hand corner with the other three corners of the metal door of the unit still in place. The partition of his darkroom, which also adjoined the furnace room on the south, was burned out.

When the fire alarm sounded about 10:10 a.m. firemen went immediately to the building. Smoke was coming from the second story windows and some of the firemen entered the ground floor main entrance. One of the firemen noticed sparks coming from the ceiling of the first floor. He said he did not know wether these sparks were fire sparks or electric sparks. He poked a hole through the ceiling at that point, and encountered pipes and metal; he put a 1½ inch hose through the hole and poured water on the fire he then saw but this had no effect on it. He then went outside to the rear of the bank building and turned off all of the gas valves supplying the building, and when he returned the fire which he had been unable to extinguish with water had gone out. He said the roof and ceiling over the unit were burned completely through to the outside, the hole being larger than the size of the unit. The portion of the floor immediately surrounding the furnace room was burned out, and he could see through into the bank below. The wall of the little room which contained the furnace was burned out. The controls and valves and front part of the furnace mechanism inside of the outer shell, were melted, charred and black, and the melted parts had run down. The floor joists of the second floor, running east and west, were burned under the furnace and to within two feet of each wall of the building. Other plaintiff's witnesses (the Donalds) who repaired the building, found the only floor damage to be along these joists, "from the corridor to the east wall."

Plaintiff had an expert witness (Mr. Murer) who said if the temperature rose 12 to 15 degrees above the thermostat setting, in his opinion there was something wrong with the controls. In addition to the thermostat there was another safety device called the limit switch which would turn off the gas when the temperature in the furnace bonnet (above the combustion chamber) reached 170 degrees. When operating as a furnace the unit and two gas burners and these controls (if working properly) would shut off the gas when it produced the proper amount of heat. There was also a fan with an automatic control in combination with the limit switch, and when operating it would keep the temperature down. Murer said, if the furnace continued to generate heat after the thermostat setting was reached, this would indicate faulty operation of the thermostat, the fan control, and limit switch control. He said there could be faulty wiring or faulty control valving or a valve could be stuck or have something on it. If all these controls failed, the furnace would continue to generate heat and the unit would eventually be destroyed by catching fire and burning up. He said the control wiring would deteriorate most rapidly, not being designed to operate under excess heat, and excess heat would destroy the aluminum tubing, opening the valve and continuing the flow of gas. Aluminum melts at a lower temperature than grass or steel. He further explained as follows: "In my opinion you would eventually end up with a breakdown of your valving and your control piping because the whole face of the unit would get hot and I believe end up with a complete failure your piping system. You would certainly end up with excessive temperatures above the unit and so long as the gas keeps shooting in there it will eventually get hot enough so as to destroy the control system. * * * When

this thing gets hot it is like anything else, it expands and when it expands regularly you have breakage that causes your trouble and leakage of gas and then of course the moment you get that you have a fire." He said the air going into the air intake went only into the combustion chamber and stated "I can't conceive how from this fire from the outside to do the damage to the controls that are evident on the pictures that were shown to me, primarily because you have a sheet metal enclosure. The sides and the door are approximately 16 guage sheet metal that are backed up with a fibre glass insulation. As the premise was given me there were no holes in the sides and no holes in the door. (He meant none were burned through the metal.) The bottom of the unit has no hole in it, another circumstance, and unless there was an actual fire between the face of the door and the face of the unit it would not be possible to get enough heat in there. * * * I can't explain the deterioration of your controls unless you had a gas fire between the face of the unit which is on that picture and the door with about 4 or 5 or 6 inches away."

To a question hypothesizing facts shown by plaintiff's evidence, Mr. Murer answered: "In my opinion you had a gas fire * * *. In my opinion they had no other source of gas. It must have been the gas for the unit." He further stated "in my opinion with those conditions prevailing you had a fire within the confines of the unit itself, within the shell of the unit;" but that "he didn't express any opinion as to whether that fire would have caught the building on fire." He said: "In my opinion you had an awful hot fire within the confines of that furnace. What happened after that I don't know." He also said, assuming all the controls were out, "if you burn it that way for an hour you'd probably have a hole plumb through your duct work on up through the ceiling because you've got a lot of heat releasing there and no cooling of any kind." Furthermore, the defendant's expert, Brick, said the main

gas intake was attached to the melted control and when this melted "then the gas main is open and there would be a tremendous flow through there" which "would create a terrific fire in and about the unit" sufficient to ignite the building "very rapidly." However, his theory was that the fire started outside the unit and was sucked into it through the louvers and melted the controls. He said if the unit operated with all the controls out it would get awfully hot around the unit and it would not last more than a season but it would be impossible to start a fire.

Defendant says the case rests on only the fact that the heating system had for some period prior to the fire tended to heat portions of the premises in excess of the temperature called for by the thermostatic setting. It says Murer told of many possible defects of the controls but there was no evidence that any of them existed; and argues that the existence of defects is sought to be shown by the opinion of Murer only and upon this opinion that all the controls were defective he based the opinion that there was a gas fire within the unit. It says plaintiff did not give the jury an opinion on facts proved but instead attempted to supply essential facts by the use of opinion evidence, citing Turner v. Haar, 114 Mo. 335, 21 S.W. 737; McAnany v. Henrici, 238 Mo. 103, 141 S.W. 633. Defendant further says Murer's testimony that the defects described by him might, could or would have produced an increase in temperature above that called for by the thermostat, shows only a possibility of a defect and is not sufficient to submit the issue of the existence of defects, citing Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 66 S.W. 2d 561; Franklin v. Kansas City Public Service Co., 239 Mo.App. 151, 186 S.W. 2d 546; Massachusetts Protective Ass'n v. Mouber, 8 Cir., 110 F.2d 203. Defendant also cites Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844; Craddock v. Greenberg Mercantile, Inc., Mo.Sup., 297 S.W.2d 541, in both of which we held the evidence therein left the cause

of the injury to speculation and conjecture and was insufficient. Defendant sums up the matter thus: "First, assuming for the purpose of argument that there was a defect in the controls of the heating system, witness Murer says if the furnace overheats, something will happen. He does not say that the furnace overheated, nor is there any evidence in the record from which it might be inferred that the furnace continuously operated. It is just as logical to assume that the furnace was turned off by the thermostat, set at 65 degrees, when the temperature in Dr. Lea's office reached 80 degrees, as it is to assume that the furnace was not turned off. Second, witness Murer admits that the limit control, if operating, serve as a safety device to check the heat generated in the bonnet. In this case that limit control was set at 170 degrees maximum. There is no evidence, nor does witness Murer suggest by his testimony, that this safety device failed to operate, which was an essential premise to his conclusion that there was a gas fire. Third, he admits that with the fan in the unit operating, the limit switch should never be called into action. There is no evidence from which it could be inferred that this fan failed to operate properly. He could not have attributed the fire to a defective thermostat without knowing that the fan and limit control both failed, of which there is no evidence."

Plaintiff had no direct evidence that all the controls were out and must rely on circumstantial evidence to so show. In support of its claim that its circumstantial evidence was sufficient to make a jury case, plaintiff cites Willey v. Fyrogas Co., 363 Mo. 406, 251 S.W.2d 635, 643; Hardwick v. Kansas City Gas Co., 355 Mo. 100, 195 S.W.2d 504, 166 A.L.R. 556; Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W. 2d 601; Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 156 A.L.R. 469. Plaintiff relies on the fact of temperatures in excess of the thermostatic setting which was sufficient to show failure of the thermostat but was not alone suffi-

cient to show that the fan and limit switch did not operate. However, in addition to this, plaintiff points out the following further facts, shown by its evidence, that defendant attempted to repair the condition causing excessive heat; and that the attempted repairs were not adequate, because: (a) The limit control was not tested under actual operating conditions after the new valves which it operated were installed. (b) Excess heat continued to be generated. (c) After the attempted repairs, a defective condition of the controls existed in that when the thermostatic setting was lowered while the furnace was operating, there was a clicking sound and the fan clicked off. The fan was designed to be turned on and off by the limit control, actuated by the heat in the furnace and not by the thermostat. (d) The location of the limit control had been changed and the control was not tested under actual operating conditions after the change. Plaintiff says the limit control was designed to shut the furnace down at a high limit of 170 degrees so that the jury could have found that when the thermostat interrupted the fan circuit, it also took the limit control, which was actuated by the same bimetallic unit, out of operation.

■ Of course, there was a fire and the most intense part of the fire was in the room where the furnace was located. It burned the ceiling and roof above the furnace, the plaster board enclosure around it and the walls of the furnace room. It also burned under the floor along the joists both east and west from the furnace room. Certainly there was substantial evidence of a fire inside the shell of the furnace unit, and outside of its combustion chamber, because the tubing was melted so as to permit the escape of gas into that space. (There was also evidence that turning off the gas outside the building stopped the fire in the furnace room.) Plaintiff's expert testified that, with all controls out, the furnace would get hot enough to melt the tubing which would permit gas to escape. Defendant's expert said it was impossible for the furnace to get hot enough to melt the

tubing. His theory was that the tubing was melted by an outside fire sucked into the shell of the furnace, and plaintiff's expert said this was impossible. It was for the jury to resolve this conflict. However, both experts agree that, if the tubing melted, a gas fire would start and we think there was sufficient evidence to show that such a fire would ignite the building. Thus plaintiff's case is not based solely upon the single fact that the furnace heated the rooms in excess of the thermostatic setting. The fact of the fire in and around the furnace, its character and the kind of damage it did, the melted condition of the furnace piping and elimination of an outside fire as the cause of such melting by plaintiff's expert testimony, all tended to show that a fire was caused to start inside the unit. A possibility that a fire could have started from defective wiring does not prevent the jury from inferring from all the facts and circumstances in evidence that it started from an overheated furnace. Our conclusion is that plaintiff's evidence is substantial, circumstantial evidence that the furnace operated without the controls working and that this was the cause of the fire. We, therefore, hold that plaintiff made a case for the jury.

■ Plaintiff alleges error in giving Instruction D–5 claiming that it prejudicially withdraws from the consideration of the jury as evidence of negligence the fact that a fire occurred on plaintiff's premises. This was a cautionary burden of proof instruction but the first paragraph was as follows: "The Court instructs the jury that the mere fact of itself that there was a fire in the premises owned by the plaintiff and that plaintiff has brought suit, claiming that the fire was the result of negligence on the part of the defendant, is no evidence whatever that defendant was in fact negligent." This was clearly erroneous. It is just not true that the fact that there was a fire in the premises owned by plaintiff *"is no evidence whatever* that defendant was in fact negligent." The fact that there was a fire

on plaintiff's premises and particularly a fire in the room where the furnace was located was an important circumstance to be considered in this circumstantial evidence case. In Dill v. Dallas County Farmers' Exchange, Mo., 267 S.W.2d 677, 679, we held erroneous an instruction which stated "that the mere fact of itself that plaintiff slipped on floor * * * is no evidence whatever that defendant in fact was negligent." (The second and third paragraphs of Instruction D–5 herein were substantially the same as the second and third paragraphs of the instruction discussed in the Dill case and we therein warned that these paragraphs were not to be recommended in a circumstantial evidence case.) We said in the Dill case (which was not a true circumstantial evidence case), concerning the first paragraph of the instruction "The fact that plaintiff fell was a fact which the plaintiff was entitled to have the jury consider in injunction with other facts shown in evidence in passing on the ultimate question of liability." An earlier case, Orris v. Chicago, R. I. & P. R. Co., 279 Mo. 1, 214 S.W. 124, 126, in which plaintiff lost his eye from a hot cinder coming from defendant's engine, an instruction stated: "The mere fact that plaintiff was injured while employed by defendant, and the fact that he has sued to recover damages therefor, are of themselves no evidence whatever of the defendant's negligence or liability in this case." We held this error, saying: "So taking all the facts, the very character of the injury would be a link in the chain of circumstances tending to prove a defective spark arrester, or negligence. The eye being burned indicates heat in the cinder as well as size. The small cinders lose their heat more rapidly upon exposure to the air. The large cinder carries its heat or burning power longer and further. So the character of the injury in a case like this tends to show a larger cinder, and a larger cinder tends to show a defective spark arrester. In cases like this the jury should consider the injury and its character in an effort to determine neg-

ligence." See also Zesch v. Abrasive Co. of Philadelphia, 353 Mo. 558, 183 S.W.2d 140, 156 A.L.R. 469; Littig v. Urbauer-Atwood Heating Co., 292 Mo. 226, 237 S.W. 779; Walker v. City of St. Joseph, Mo.App., 231 S.W. 65. The "no evidence whatever" submission was held not erroneous in Gardner v. Turk, 343 Mo. 899, 123 S.W.2d 158, 161, in which the submission was "that the mere fact of itself that decedent lost his life * * * is no evidence whatever that defendant was in fact negligent." As to this, we said "the fact of itself that decedent lost his life could not have thrown any light on the question of defendant's alleged negligence." A similar instruction was held not reversibly erroneous in LeGrand v. U–Drive–It Co., Mo., 247 S.W.2d 706, 711, in which the words "plaintiff was injured" were substituted for the words "decedent lost his life." Both were cases of a pedestrian struck by an automobile and nothing was withdrawn by the instructions in either which tended to make a circumstantial evidence case. There would usually be a difference in making such a statement about "injury" or "death", the ultimate result, and a fact in the chain of circumstances, like "slipping" or "fire", which is part of the causation bringing about the ultimate result of injury or damage, and so the instructions may not have been prejudicial in the Gardner and LeGrand cases. However, the proper submission for such a cautionary burden of proof instruction would be, as submitted in Gladden v. Missouri Public Service Co., Mo.Sup., 277 S.W.2d 510, 516, cited by defendant, that "the mere fact that plaintiff was injured at the place described in evidence, if so, does not in and of itself entitle plaintiff to a verdict." See also Jones v. Kansas City, Mo., 243 S.W.2d 318, 321; and other cases cited in the Gladden case, 277 S.W.2d loc. cit. 517. The "no evidence whatever" submission would certainly be wrong in withdrawing from the jury any fact that could properly be considered in a circumstantial evidence case and our conclusion is that it was erroneous and highly prejudicial in this case.

■ Since the case will likely be tried again, we hold that there is no merit in plaintiff's contention of error in the overruling of its objections to the testimony of defendant's expert Toensfeldt. The questions objected to asked for the manner in which electrical fires can start and from what causes; and the effect of leakage of oil or water to break down insulation of wires. The objections were that there was no evidence of any electrical fire starting and that there was no evidence of a leak. Plaintiff says the opinion of an expert is not admissible unless the facts upon which it is given are clearly proved by or readily deduced from the evidence, citing Cardinale v. Kemp, 309 Mo. 241, 274 S.W. 437; McAnany v. Henrici, 238 Mo. 103, 141 S.W. 633; Henson v. St. Louis-San Francisco R. Co., 301 Mo. 415, 256 S.W. 771; Hild v. St. Louis Car Co., Mo.App., 259 S.W. 838; Anderson v. Prugh, 364 Mo. 557, 264 S.W. 2d 358. These cases are not in point because Toensfeldt was not asked to and did not give an opinion that any leak caused or contributed to cause an electrical fire in plaintiff's building. Instead, he only was asked what was scientifically possible to cause deterioration of insulation of wires based on his own personal technical knowledge. In Kimmie v. Terminal R. R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561, 565, we said: "We do not hold, however, as defendant contends, that it is improper to ask an expert witness if something might, could, or would produce a certain result. An expert's view of possibility or probability is often helpful and proper." See also Baker v. Kansas City Terminal Ry. Co., Mo., 250 S.W.2d 999; Hunt v. Armour & Co., 345 Mo. 677, 136 S.W.2d 312; Massachusetts Protective Ass'n, Inc., v. Mouber, 8 Cir., 110 F.2d 203; 32 C.J.S. Evidence §§ 477–478, p. 129. Defendant had some circumstantial evidence of an electrical fire. There was evidence of electric wires under the floor in the burned floor areas, also of nearby water pipes and dental chairs operated by hydraulic oil. Of course, Toensfeldt could not assume without evidence that there

was deterioration of the insulation of wires under the floor and then give an opinion that defective insulation caused the fire and he did not do so.

The judgment is reversed and the cause remanded.

All concur.

On Motion for Rehearing or for Transfer to the Court En Banc

PER CURIAM.

Defendant says we have misconstrued the facts in indicating the fan switch and the limit switch were operated or activated by the same control. Defendant says that while their controls were housed in the same metal cover and were both activated by the heat in the plenum chamber (called the furnace bonnet in the opinion), they operated separately; and defendant claims "that fact makes it impossible for any defective condition of the thermostat to interfere with the operation of the limit control, and likewise would preclude a defective condition in either the fan or limit switch from affecting the other."

Defendant's witness Eoff called this "a double switch" and "a limit and fan switch combination". He also said: "The wire goes through here and up to these two junctions here, one is your fan switch and one is your limit switch. * * * This spring will expand and contract with heat and cold. This is an on and off expansion and contraction here which operates the switches in front. * * * On this side you have the limit control which is calibrated from a hundred to two hundred degrees; * * * (It was set to turn off the gas at 170 de-

grees temperature in the bonnet.) * * * Now, on this side we have a fan control * * * set for 140 degrees on and 110 degrees off * * * when the bonnet temperature would reach 140 degrees the fan would automatically come to its cycle and the contact would close which would put your fan on and move the warm air out of the plenum or bonnet of the furnace. Then, after it reached and cooled down to 110 degrees this here would actuate the switch again and close the circuit or open the circuit here which would stop the fan." Whatever this testimony means, when considered most favorably to plaintiff's contentions, it appears that, although the switches may have operated separately, they were both operated by the heat in the bonnet from expansion or contraction of the bi-metal coil spring. If the fan operated it would never get hot enough in the bonnet to operate the limit switch, but if the fan did not operate and the limit switch also failed and did not turn off the gas, then according to plaintiff's evidence it would get hot enough to melt the aluminum pipes, which would allow gas to escape and start a gas fire. These pipes did melt and defendant concedes, in its suggestions, that "there is no dispute that a gas fire occurred within the shell of the furnace," but claims it was started from a fire outside.

We adhere to the view expressed in the opinion that there was substantial circumstantial evidence from which the jury could find that all controls failed. Other matters discussed in the motion constitute a reargument of contentions made in the briefs which we have ruled in the opinion.

The motion for rehearing or to transfer to Banc is overruled.