SAM CARDINALE, by Next Friend, AUGUSTINO CARDINALE, Appellant, v. T. J. KEMP, M. D., and HALLIE McELWEE, Administratrix of Estate of L. C. McELWEE.

Division One, July 1, 1925.

1. **EVIDENCE: Objections Sustained: No Further Proffer of Proof.** Where the trial court sustains objections to questions propounded by plaintiff's counsel, because the matters and things referred to and incorporated in them do not come within the allegations of the petition, it is the duty of counsel, if he desires such rulings reviewed upon appeal, to state to the trial court what facts he expects the witness would testify; and if he fails to offer to prove what he considers are relevant facts attempted to be elicited by the questions, after objections thereto are sustained, it cannot be ruled on appeal that the trial court erred in sustaining the objections.

2. ———: ———: ———: **Demurrer to Evidence.** Whether or not specific acts of negligence can be inferred by the jury from the

309 Mo. Sup.—16.

evidence, and whether or not negligence can be proved by the opinions of experts, it cannot be ruled that the trial court erred in sustaining a demurrer to plaintiff's case and in instructing the jury to return a verdict for defendants, where counsel for plaintiff, when objections to his questions propounded to the expert witnesses were sustained, made no offer to show what he expected to prove by such witnesses, and without such proof there is no evidence to sustain the allegations of the petition.

3. **NEGLIGENCE: Speculative Inference: Different Causes of Injury: Malpractice: Injury to Eye.** An allegation that defendant physicians in removing a cyst from plaintiff's eyelid "failed in the performance of said undertaking by negligently and carelessly and unskillfully permitting a sharp instrument with which they were removing such cyst to come in contact with the eyeball of said eye, whereby the said eyeball was cut and wounded, causing the sight of said eye to be totally destroyed," is not sustained by proof that the adhesion of the eyelid to the eyeball and a scar on the eyeball, shown by the expert to be present eight months after the operation, could have resulted from one of three causes, namely, a sharp-pointed knife carelessly used in the operation, a blunt instrument used in raising the lid at the time of the operation, or a deep-seated infection produced by hurtful bacteria introduced into the raw tissue of the eyelid after the operation, for after such a length of time no expert could with any degree of certainty or even probability say which of the three causes produced the adhesion or scar, and as he testified that either of the three might have caused it, and his was the only testimony on the point, the allegation was not proved.

4. **EXPERT TESTIMONY: Must be Based upon Proven Facts.** Expert testimony must be hypothesized upon facts or conditions conceded to be true, or existing, or assumed to be established by other testimony. In an action for malpractice based on a charge that defendant physicians, in removing a cyst from plaintiff's eyelid, carelessly "permitted a sharp instrument to come in contact with the eyeball," the cut of the eyeball cannot be established by the opinion of an expert surgeon; and there being no proof of any sort that there was a cut on the eyeball, the fact that a sharp instrument came in contact with the eyeball could not be established by the opinion of the expert.

5. **NEGLIGENCE: Proof of Allegations: Inference upon Inference.** Plaintiff cannot make out his case by building one inference upon another. An allegation that defendant physicians, in removing a cyst from plaintiff's eyelid, failed in the performance of said undertaking by negligently "permitting a sharp instrument with

which they were removing such cyst to come in contact with the eyeball, whereby said eyeball was cut and wounded, causing the sight of said eye to be wholly destroyed," is not established by proof that after said operation blood exuded from the eye for several days, adhesions of the eyelid to the eyeball appeared, a scar appeared on the eyeball and the eye became blind. The negligence charged cannot be inferred from these facts. To permit a verdict for plaintiff to rest upon negligence inferred from them it would be necessary for the jury to infer that the scar found on the eyeball was produced by a cut, that the defendants caused the cut, and that the cut caused the loss of the eye.

Corpus Juris-Cyc. References. **Appeal and Error,** 3 C. J., Section 736, p. 825, n. 53. **Evidence,** 22 C. J., Section 27, p. 84, n. 70, p. 85, n. 72; Section 804, p. 714, n. 97. **Physicians and Surgeons,** 30 Cyc. pp. 1587, n. 78; 1588, n. 83.

Appeal from St. Louis City Circuit Court.—*Hon. Charles B. Davis,* Judge.

AFFIRMED.

*Milton G. Rosenfeld, Edward A. Raithel, Louis E. Zuckerman* and *Julius G. Selvaggi* for appellant.

(1)   The court erred in sustaining defendants' demurrer to the evidence and in giving and reading to the jury defendants' instruction in the nature of a demurrer to the evidence. There was sufficient evidence from which an inference of negligence could have been drawn by the jury. Stratton v. Barnum, 263 S. W. 478; Peak v. Taubman, 251 Mo. 390; Enloe v. Am. Car & F'dry. Co., 240 Mo. 443; Kelley v. Ross, 165 Mo. App. 475; Ertel v. Warren, 157 Mo. App. 592; Maginnis v. Mo. Pac. Ry. Co., 268 Mo. 667; Troll v. 'Ehrler Dray. Co., 162 S. W. 185; Krinard v. Westerman, 216 S. W. 940; Eichholz v. Poe, 217 S. W. 282; Sontag v. Ude, 191 Mo. App. 617; Leeright v. Ahrens, 60 Mo. App. 118; Hague v. Threadgill, 236 S. W. 897; Tate v. Tyzzer, 234 S. W. 1040.   (2) The court erred in excluding competent, relevant and material testimony of Drs. Shahan and Jacobs, offered in evidence by plaintiff. Cecil v. Wells, 259 S. W. 849;

O'Leary v. Scullin Steel Co., 260 S. W. 61; Hague v. Threadgill, 236 S. W. 896.

*R. P. & C. B. Williams* for respondents.

(1)   The sole and only issue of fact in this case was: Did the defendants, in performing the operation upon the eyelid, negligently cut the eyeball? It was clearly not proper to prove this fact by opinion evidence. It was not a proper subject of scientific or expert testimony, and the demurrer to the evidence was properly sustained. McAnany v. Henrici, 238 Mo. 103; O'Leary v. Scullin Steel Co., 260 S. W. 55; Glasgow v. Railroad, 191 Mo. 347; Deiner v. Sutermeister, 266 Mo. 505; Castanie v. United Railways, 249 Mo. 192; Henson v. Kansas City, 277 Mo. 443; Markel v. Railroad, 205 Mo. App. 485.   (2) That there was an adherence of the eyelid to the eyeball and a scar on the latter eight months after the operation on the lid, with the opinion of the experts that a cut could cause such a condition, was no evidence that the defendants cut the eyeball; a case cannot be made by speculation and conjecture.   Pate v. Dumbald, 250 S. W. 49; Swearingen v. Railroad, 221 Mo. 644; Swartz v. Frank, 183 Mo. 438; Marlow v. Kilgen, 252 S. W. 424; Perkins v. Wilcox, 242 S. W. 974; Weber v. Valier, 242 S. W. 985. (3)   All expert testimony must be predicated upon facts or conditions conceded to be true, or existing or assumed to be established by other testimony, and that necessarily excludes the possibility of basing one opinion upon another opinion.   In this case there was no proof of any sort that there was a cut of the plaintiff's eyeball by the defendant.   This fact could not properly be proved by an opinion.   To assume it, without any proof, as the producing cause of the condition found, would be to have the experts find the facts and decide the case—on guess work.   McAnany v. Henrici, 238 Mo. 103; O'Leary v. Scullin Steel Co., 260 S. W. 55; Deiner v. Sutermeister, 266 Mo. 505; Glasgow v. Railroad, 191 Mo. 347; Wood v. Railway, 181 Mo. 450; Castanie v. U. Ry. Co., 249 Mo.

192; Henson v. Kansas City, 277 Mo. 443; Taylor v. Metropolitan, 256 Mo. 191; McNulty v. Atlas Cement Co., 249 S. W. 730; McAuliff v. U. Rys. Co., 237 S. W. 129; Smart v. Kansas City, 208 Mo. 162; Willis v. Kansas City, 199 S. W. 736; Ruch v. Prior, 190 S. W. 1037; Jackmann v. St. Louis, 187 S. W. 786; Mahoney v. K. C. Ry., 286 Mo. 601; Kinchlaw v. Kansas City, 264 S. W. 416. (4) A case cannot be made out by building one inference upon another. In order for plaintiff to prevail on his theory, it would have to be inferred that the scar found upon the eyeball was caused by a cut and the further inference that the defendants caused the cut, and the still further inference that the cut caused the loss of the sight. This cannot be done. Hays v. Hogan, 273 Mo. 1; Hamilton v. Railway, 250 Mo. 715; Swearingen v. Ry. Co., 221 Mo. 664; Yarnell v. Railway, 113 Mo. 570; Weber v. Valier, 242 S. W. 985; Frost v. Central, 246 S. W. 628; Glick v. Railway, 57 Mo. App. 97; Swartz v. Frank, 183 Mo. 438; Pate v. Dambauld, 250 S. W. 49. (5) Where general negligence is alleged and this is followed by specific acts, plaintiff, if he recovers at all, must recover upon the special acts. Allen West v. Richter, 286 Mo. 706; Roscoe v. Metropolitan, 202 Mo. 576; Byers v. Esser, 219 S. W. 571; McGrath v. St. Louis, 197 Mo. 97; Weber v. Valier, 242 S. W. 985. (6) It is well settled that where there are several acts of negligence pleaded, but only one ground of negligence is alleged to have caused the injury, the jury must be confined to that ground, and it is error to submit other alleged acts of negligence. Witham v. Lusk, 190 S. W. 403; State ex rel. v. Ellison, 176 S. W. 11; Kirby v. Railroad, 146 Mo. App. 304; Nelson v. Railroad, 113 Mo. App. 706. (7) Where plaintiff's proof shows merely that his injury was due to one of several causes, for only one of which could defendant be liable, there can be no recovery. Viewing the case in the light most favorable to plaintiff, giving him the benefit of every inference which may be reasonably drawn in his favor, the matter is still left merely to speculation and conjecture. Nevinger v. Haun, 197 Mo.

App. 416; Freeman v. Loyal, 196 Mo. App. 383; Rodgers v. Hammond, 180 Mo. App. 227.; Weber v. Valier, 242 S. W. (Mo. App.) 985; Frost v. Central, 246 S. W. (Mo. App.) 628.

WOODSON, J.—The plaintiff brought this suit by his next friend, in the Circuit Court of the City of St. Louis, against the defendants for $30,000 damages for personal injuries caused by malpractice in performing an operation upon one of his eyes. A trial was had before the court and jury, and at the close of the plaintiff's evidence the defendant offered a demurrer thereto, which the court gave, and thereupon the plaintiff took an involuntary nonsuit, with leave to move to set the same aside, which he accordingly did. In due course the same was presented to the court and after due consideration the court overruled the same. Thereupon he duly appealed the cause to this court.

The defendant Dr. McElwee died before the trial was had, and his widow was duly appointed administratrix of his estate, and the suit was duly revived against her as such. The petition, after making the preliminary allegations of the cause of action, charged the sole negligent act of the defendants to consist of negligently cutting the eyeball of the plaintiff with a sharp instrument, while removing a cyst from his left eye and thereby so injured same as to cause it to shrink and to loose the sight thereof.

The theory of the trial court was that the evidence for the plaintiff did not make out a case for the jury, and therefore it sustained the demurrer to the evidence offered by the defendants. This ruling of the court requires us to consider the substance of all of the evidence introduced, in order to see whether or not the court was correct in that ruling.

The plaintiff introduced a number of witnesses who testified substantially as follows:

Augustino Cardinale, a witness for plaintiff, testified, on direct examination, that he is the father of Sam

Cardinale, who is four years old; that witness is an ele-
vator operator; that he has been married four years
and has three children; that he now lives and on Jan-
uary 8, 1920, lived, at 5202 Plover Avenue; that he first
noticed a pimple or cyst on the eyelid of his boy, Sam,
when his wife sent him a picture to France; that he
looked at the eye of the child and he had a kind of
pimple on his eye; that he first saw this in the picture
that his wife sent him to France; that about six months
thereafter, when he came back, he saw Sam; that when
he came home and saw Sam he had a pimple or cyst
on the upper left eyelid; that he went to see Dr. Kemp
about the cyst or pimple on the upper left eyelid of
Sam some time in January, 1920; that Dr. Kemp looked
in. the child's eye, and he said: ''This pimple here
would have to be removed, but that is an easy operation
on him. So he won't lose his eye at all.'' I said, ''All
right; if he won't lose his eyesight and it is easy, why,
if you want to do it, do it.'' So he said to me, ''Well,
I couldn't do it in my office; I couldn't do it myself,
either. I will take a partner with me and I came up to
his office and have him operate on your kid.'' So when
I come in the afternoon—

''Q. Wait a moment. Who came where? A. Dr.
Kemp and McElwee.

''Q. Where did they go or come to? A. 5202
Plover Avenue.

''Q. Go ahead. A. So they came in. They said,
'Well, we was a little late.' I said, 'That is all right.'
As soon as they came in I said, 'Doctor, if you doctors
understand the business, why, go ahead and do the work.
If you don't, I won't pay your expenses coming up here,'
and Dr. Kemp and Dr. McElwee they said they had forty
thousand cases.

''Q. What was that last? A. Dr. Kemp and Dr.
McElwee they told me, they said we have forty thousand
cases make like that with a pimple in the eyelid.

''Q. You just said that Kemp told you that he had
forty thousand of similar cases? A. Yes.

"Q. And did he say that he had removed the cysts in all those cases? A. Yes, sir; he had forty thousand cases just like my kid."

That the doctors chloroformed the child while he was asleep; that witness saw the doctors turn the child's eyelid. I said, "What you do?" "We want to remove from the inside." I said, "What for?" He said, "You cut him off inside."

The witness further testified:

"MR. WILLIAMS: Q. Wait a minute. What do you mean by the eyelid up? A. The eyelid was turned up.

"Q. Turned up like that? A. With an instrument. I told him, 'What you doctors doing?' They said, 'We are going to take the cyst from the inside.' I says, 'Why, you told me from the office to take it from the outside and it was easy.' 'Well,' he said, 'from inside it won't leave no scar.' So I said, 'You the doctors; you know your business.' They said, 'Yes.'"

Witness further testified that this occurred after Dr. Kemp had given the child chloroform and had him on the table; that Dr. McElwee had the instrument in his hand and both of them were working on the boy; that he turned the eyelid up and started to scrape from the inside; that he had an instrument in his hand at that time resembling a pair of scissors and a little lance; that it looked just like a knife; that witness left the room for three or four minutes to get a towel; that when he returned with the towel he went inside the room where the child was being operated on; that he saw the child's eyelid upside down and the doctors working on it; that the doctors told him they were operating from the inside so it won't leave a scar; that he was in the room while the doctors were operating to remove the cyst during all the time except when he left to get the towel; that after the operation the doctors bandaged the child's eye with a piece of cotton and put a bandage on it; that the bandage went around his head, covering his left eye and leaving the other open; that this was in the afternoon; that the doctors took their coats and told the witness to

bring the child to the office every other day; that witness
sent his wife to the office because he had to work; that
after the operation the child cried; that the child slept
between witness and his wife; that witness held one hand
and his wife the other because he was afraid the bandage
might be moved; that the child was restless about ten
or eleven o'clock that night and was suffering pain; that
he rested two or three hours and then cried again; that
he saw Dr. Kemp a week later when he took the child
to his office; Dr. Kemp took the bandage off, looked in
his eye, put some medicine in it, and said, "The eye
was coming fine;" that he washed the eye and put the
bandage back with a piece of cotton; that Dr. Kemp told
him, "When you go home warm a little warm water and
get a piece of cotton and if you see the eye run a little,
wash it out"; that he saw the doctor again two weeks
after; he examined the eye again, took the bandage off,
put medicine in the eye "and he said the eye was all
right. So it was all right, he said;" that Dr. Kemp said
this and put a piece of cotton and bandage back on;
that the bandage was not taken off from the time that
the doctor put it on until witness or his wife took the
child back to the doctor; that witness never saw the
bandage come off; that witness saw the doctor the next
time; that he did not see any improvement in the child's
eye; that he went to Dr. Kemp and said "Doctor, I am
the father of the child, so that is over a month now, and
didn't see any improvement in the kid's eye at all. See
what you can do;" that Dr. Kemp called Dr. McElwee,
who got hold of his eye and opened it and when he opened
his eye, "I see he never had no eyeball at all. Just
covered with flesh. So they telephoned to Dr Norris;"
that Dr. Kemp took witness to Dr. Norris; that witness,
Dr. Kemp, the child and witness's wife were present at
the time; Dr. Norris examined the eye and washed it out
with a syringe to keep the pus out; that witness asked
Dr. Norris if the child could have his eye back; that Dr.
Norris said he did not know, but thought the eye infected;
that perhaps the child had put a finger in his eye; that

witness told Dr. Norris that was impossible because he had his bandage on all the time and witness's wife took care of him during the time the bandage was on his eye; that Dr. Norris told them to come back the next day; that witness first discovered that the child's eye was destroyed and that he was blind in that eye the next day when he went to Dr. Norris; that the child suffered pain in his eye for five or six days after the doctors operated on him, and that he never rested much.

Witness, recalled, testified that the doctors were at his house about three-quarters of an hour on January 8, 1920; that he was in the room about twenty minutes while the doctors were there; that one of the doctors told him to get a towel; that he hurried to get a towel in another room which took him about three or four minutes; that he re-entered the room where the doctors were; when he got back the doctor had the child on the table and they started working on him; that they had the eyelid upside down and were working on it when he went in; Dr. McElwee had a scraper in his hand, like a knife in his hands, and he shook with his hands.

"Q. His hands shook? A. Oh, yes; shivered.

"Q. Did you notice that his hand was shivering, or shook, as you say? A. Yes."

That his hand was right close to the eye; that when the witness noticed his hand shake Dr. McElwee had a thing in his hand just like a knife; that at that time Dr. Kemp was holding the child's eyelid and had a piece of cotton in his hand; that blood was running from his eye, "out of the side of the face and then that came down on top of his little dress;" that blood came down on his dress; that blood was all in the eye, in eyebrow and under the eye and then around through the side of his face and ran down his little dress; " that Dr. Kemp was sponging that up, to clean out his eye and his face;" that Dr. Kemp had a piece of cotton in his hands and at the time to sponge up the blood; that Dr. McElwee changed his position after witness came into the room and saw Dr. McElwee with the knife near the eye of his

son Sam; that Dr. Kemp got hold of the knife and started
working on it and McElwee was holding the child and had
a piece of cotton in the hand to wipe the blood; that when
he saw this blood at the eye, the left eye, of his son Sam,
he could see the eyeball at that time; when that was
through he saw when Dr. Kemp had the knife in his
hand and pulled the root out of the cyst; when they had
the eyelid turned up they did not bring the cyst upward;
that the cyst was right in the line here, and there was
right on top of the eyelid and not on the bottom and so
they turned his eyelid real close together so the little
cyst, it was trying to show on the bottom, but there was
pressure with some kind of a pincer he had in his hand;
that this cyst was just showing when they turned it up,
kind of pressed down with the instruments that they had
there; that when the eyelid was turned up the cyst was
high; that the eye was running full of blood and they kept
wiping him off; that the picture shown him is his son
Sam; that said picture shows the way the child looked
before the operation; that it was taken about a year
ago; that he was then about a year old; that he was
eighteen months old when they operated on him; "that
is the pimple he had in his eyelid right in the top" (in-
dicating on picture); which picture was offered in evi-
dence, marked "Plaintiff's Exhibit I"; that witness saw
the doctors operating on the child's left eye; the witness
pointed out to the jury where he saw the doctors operat-
ing on the left eye; that it was right on the corner where
the cyst is; that it was about twenty minutes after wit-
ness came into the room with the towel before the doctors
left; that the doctors put cotton and a bandage on the
eye after they had operated on him; that the doctors put
their hats and coats on and started out after the opera-
tion was finished; that the doctors told witness to bring
the child to their office every other day.

On cross-examination witness testified he was right
there and did not leave the room and stay out when he
got a towel; that the bandage got a little loose and he
tied it up; that the bandage never came off, but was right

on the eye and got loose then; that when his deposition was taken he testified it didn't come off many times, about three or four times; then when the doctor told him to take it off the bandage was taken off; that the bandage never came off altogether, but was just a little loose; that some time in March he took the child to Dr. Kemp's offce, who advised that there was an infection there and that it should be taken to an eye specialist; that Dr. Kemp called in Dr. McElwee at that time who also examined it; that then Dr. Kemp, witness and his wife took the child to Dr. Norris's office in the Century Building; that Dr. Norris saw the child and examined him; that witness talked with him while Dr. Kemp was there; that witness's wife brought the child back, at Dr. Norris's request, the next day; that witness did not take the child to Dr. Norris any more, but took him to another doctor; that witness took the child to Dr. Burke, whose name he got from a friend; that witness does not remember how long Dr. Burke treated the child, but thought about three or four months, and that Dr. Burke was an eye specialist.

On re-direct examination witness testified that, at the time that he and his wife and the child went to see Dr. Kemp and Dr. Kemp took them to see his friend, Dr. Norris, the eye specialist, witness complained to Dr. Kemp at that time about the child's eye; that he brought the child to his offce and told him he could not see any improvement in the eye; that Dr. Kemp called Dr. Mc-Elwee, next door, and McElwee came in the room and they both examined the child and Dr. McElwee told Dr. Kemp to call Dr. Norris; that Dr. Kemp said, "I will take you to an eye specialist. We will come out for sure." That witness said, "All right."

On re-direct examination witness identified an instrument shown him and said he saw one of them before, which was the one the doctor had in his hand; that Dr. McElwee had it the first time; and witness identified another instrument and said he saw it, too.

Marie Cardinale, a witness for plaintiff, testified that she is the wife of Augustino Cardinale, who just

testified, and mother of Sam Cardinale; that she has lived at 5202 Plover Avenue, St. Louis, for about twelve years; that she lived with her mother three years after she was married, while her husband was away in France; that her son, Sammy, will be four years old the 11th of June; that she first noticed the pimple or cyst on the left upper eyelid of her son, Sam, while he was about four or six months old; that it began to show on top of his left eyelid; that it was on the outside; that he had that on until he was operated on; that when her husband got back from France they thought they would have it taken off; that this was some time in January, 1920; that they took the child to Dr. Kemp's office; that he told her she should not worry, because it was the smallest operation that could be done; took his advice and had it done; that it was some time one Sunday morning in January when she and her husband were at Dr. Kemp's with Sam; that the doctor told her he could not do the operation in the morning, would need someone to help him, would be over to her house that Sunday afternoon about three o'clock; that the doctors got there about five o'clock; that both doctors got there, but Dr. Kemp said he could not do the operation by himself; that when they got there the child was sleeping, and Dr. Kemp gave him chloroform; that she did not stay in the room; that the doctors were gone at six o'clock; that while they were operating on the child he was calling for his mother; that she came upstairs, but they would not let her know; that Dr. Kemp and Dr. McElwee were up there after they had the bandage on the child's eye, and she went in the room and was holding him; that they were paid and then went away; that the bandage was on his left eye; that it went around his head, covered his left eye, over his forehead and around the back; that the bandage was not so wide, because she took a cloth herself and put it over the bandage so it would not get loose; that the child did not touch the bandage; that he was crying with pain; that he kept both eyes shut for a good while; that he was crying for a long time and weeks after that; that all that while his

left eye was running; that before the doctors operated his eye was clear; that he could not sleep very much, because he woke up with pain; that she and her husband had to hold him; that the next day he was all tired out and slept a couple of hours; that on Tuesday she took him to Dr. Kemp; that she knew no other doctor; that Dr. Kemp told her to bring the child to his office on Tuesday after the operation, and every other day; that for the first week they brought him there every other day, because her sister helped her carrying the child; that her sister was in the court room; that she stayed with her to help her do the housework while the child was sick; that on the Tuesday after the operation Dr. Kemp put the child on the table at his office and washed his eye out with a little cotton in warm water and then poured black medicine in his eye; that he removed the bandage before applying this wash; that the doctor said it was getting along all right; that he put the bandage on again and told her to bring him back every other day; that she went to the doctor's office every time he told her to come; that for the first week, she thought, she went there about two or three times a week, and then he told her to bring him twice a week, and then later he told her to bring him once a week; that when they found out the child's eye was gone he told her to bring him every two weeks; that the doctor took the bandage off and examined the eye every time on all these visits; that in the first three or four weeks the doctor said nothing to her about the eye being in bad shape; that Dr. Kemp said the eye was getting along all right; that Dr. Kemp told them to bring the child down and he would have a specialist look at his eye; that they went to see him on a Sunday and he told them to come back to his office on Wednesday afternoon; that he would have a specialist look at his eye, so that he would be sure that his eye was all right; that on Wednesday her husband stayed home from work and they went to Dr. Kemp's office; that he called Dr. McElwee, who examined the eye and told Dr. Kemp to take them to Dr. Norris, in the Century Building; that Dr. Kemp put

them in the machine and took them up there; that she did not know Dr. Norris up to that time; that they did not find out that the eye was gone until after Dr. Kemp had taken them to Dr. Norris; that the child was suffering all the time; that his eye was sore during the time beginning with the time of the operation until this time she is speaking of; that she at no time took the bandage off of Sammy's eye herself; that sometimes it got loose and she tightened it up; that she took it off when Dr. Kemp told her to; that it was about three of four weeks after that, and he wrote a prescription and told her to wash the eye and drop the medicine in. Witness further testified:

"Q. After the operation, and on the Tuesday, the first Tuesday after the operation, when you took Sammy to Dr. Kemp's office, did you see Sammy's eye or not at that time at Dr. Kemp's office. A. I couldn't see the eye. It was only red inside.

"Q. It was red? A. Yes, sir.

"Q. Well, did you notice anything else? A. No, sir.

"Q. I will ask you to state if you remember whether or not you noticed any blood about the eye at that time? A. I don't remember, but I know it was all red.

"Q. It was all red? A. Yes, sir.

"Q. About when was it, do you recall, Mrs. Cardinale, when Dr. Kemp took you and your husband and Sam to Dr. Norris's office; about when was that? A. I don't remember, but it was pretty long time afterwards. Some time in March, I believe."

Macie Saguto, a witness for plaintiff, testified that she is the sister of Mrs Cardinale, the mother of little Sam; that she went to stay with her when she had the baby sick, in January, when the operation was had on the boy; that she stayed with her about two weeks; that she came there on Monday and stayed there all of the time for the next two weeks; that she did the housework and she took care of the boy; that during the time she was there Sammy was crying; that during the time she was there she never saw the bandage taken off of Sam-

my's eye; that she accompanied Mrs. Cardinale with Sam to Dr. Kemp's office on two occasions; that she asked the doctor, "What is the matter with the boy's eyebrow, it stays closed all the time." He said, "It is awful sore." Then he took the bandage off and he washed it a little bit and then he put the medicine in his eye; that she asked him how the eye was getting along, and that he said it is awful sore.

Dr. William E. Shahan, a witness for plaintiff, testified that he is a physician; that he is an eye specialist; that he has been specializing in the treatment of the eye for eighteen years, since 1904, when he graduated from Washington University Medical School; that he is a member of the St. Luke's Hospital, the Barnard Free Skin & Cancer Hospital, and is head of the eye department of Washington University, Barnes Hospital and St. Louis Children's Hospital; that he saw little Sammy Cardinale on August 12, 1920, and made an examination of him at that time; that he found the left eyeball shrunken, the lid adherent to the eyeball where there had been a rupture or break in the lid, and also in the eyeball, so that the two subsequently grew together; that they were still together at the time he saw them; that the vision was destroyed; that he was blind in the eye; that there was an adhesion there on the eyelid and the eyeball.

The court sustained the following objection, to which plaintiff duly excepted:

"Q. From your observation of the condition that existed at that time, are you enabled to tell the jury and the court what, in your opinion, caused that condition that was then existing?

"MR. WILLIAMS: Now, if your Honor please, I object to that, because that is a question for the jury to determine in this case, whether or not the infection by which the loss of the eye was caused is a question of fact for them to determine and not a question for the witness to determine.

"THE COURT: Sustain the objection.

"MR. RAITHEL: We except."

Witness further testified that he found an unusual condition of the eyeball; that the condition was unusual in that the eyeball and eyelid were grown together; that there was a scar on the back portion of the eyelid and front of the eyeball which caused the lid to be pulled in slightly toward the wound, towards the site of injury; that that condition was evidenced by the eyelid and the eyeball being adherent and a mass of tissue there surrounding the scars, both on the eyeball and the eyelid; that from the examination he made at that time he is able to say that the scars around the lid and the adjacent portion of the remains of the eyeball are closely intermingled and entangled so that the whole site of the injury is a mass of scar tissue, surrounded by tissue that is not so much scar tissue, that is, half tissue, so that the scars are more or less covered up by the lid and the eyeball being stuck together, only the lower part of the scarred eyelid and the eyeball still showing; that from the way the eyeball and eyelid are stuck together it would appear it was a linear scar extending up and down; that the place of the incision in the eyelid and the place of the injury to the eyeball are stuck together; that in his practice he has removed cysts in the eyelids of patients; that the usual length of time, given a normal subject, that it would take for such a wound from such an operation to heal, would be not more than a week; that in the course of the performance of an operation for the removal of a cyst in upper left eyelid, if no cut or wound is made in the eyeball at the time of the operation, the eyeball and the eyelid would not grow together in the manner that he has described that he found existed when he examined this boy on the 12th of August, 1920.

The court sustained an objection to the following question, to which exception was duly saved:

"Q. Doctor, in your experience in the performance of operations for the removal of cysts in eyelids—we will confine ourselves to the upper eyelid—is it a usual or an unusual occurrence for the operator to cut or wound

the eyeball in the course of the operation to remove a cyst from the eyelid?

"MR. WILLIAMS: Now, I object to that, if your Honor please, because it is assuming the doctors cut and wounded the eyeball.

"THE COURT: Sustain the objection."

The court sustained an objection to the following question, to which exception was duly saved:

"Q. I will ask you to state, doctor, whether or not, in your opinion, it is a usual or an unusual occurrence for an operation for the removal of a cyst in the upper eyelid for the eyelid and the eyeball to adhere or grow together?.

"MR. WILLIAMS: Now, I object to that for the reason already given, and the condition he found to exist was long after the doctors were discharged from the case, and the question is for the jury to determine, and invades the province of the jury; and for the further reason whether is is unusual or usual is immaterial.

"THE COURT: Sustain the objection."

Witness further testified that he could not say how old that scar was.

The court sustained an objection to the following question, to which exception was duly saved:

"Q. Suppose, Doctor, that during a period of three weeks the operation to the upper eyelid for the removal of a cyst, there is a growing together or adhesion of the eyeball and eyelid, after such an operation, what, in your opinion, would be, the cause of such growing together of the eyeball and the eyelid?

"MR. WILLIAMS: I object to that as having no reference whatever to the case now before the court and jury. He has testified about a growing together many months afterwards. It is speculating on a matter that has nothing to do with any facts or issues in this case.

"THE COURT: Sustain the objection."

The court sustained an objection to the following question, to which exception was duly saved;

"Q. In your experience, Doctor, in operating for the removal of cysts in the upper eyelid, I will ask you whether or not it is a usual or unusual occurrence for any injury to be inflicted on the eyeball while in the performance of that operation?

"Mr. Williams: I object to that, if your Honor please, as pure speculation.

"The Court: Sustained."

The witness further testified that the usual result with reference to healing up and clearing up after an operation for the removal of a cyst in the upper eyelid is that it will usually heal without any permanent ill effects within a few days; that after such a healing, which he said ordinarily takes place in a few days, it is unusual for the eyeball and the eyelid to grow together and adhere.

Dr. Max W. Jacobs, a witness for plaintiff, testified that he lives at 5783 Pershing Avenue; that he is a physician specializing in diseases of the eye since 1905; that he is a graduate of Washington University, St. Louis; that he has done post-graduate work in the University of Vienna, one of the German universities at Freiburg and in London; that since 1909 he has specialized and confined himself exclusively to the treatment of the eye; that his office is in the Carleton Building; that he is connected with Washington University Medical School, Barnes Hospital, Jewish Hospital, City Hospital, visiting staff; that in the course of his practice he performs operations on and about the eye; that, commonly, by cyst we mean an enlargement of one of these small glands in the lid; that the enlargement is a result of inflammation in the lid, speaking now of the usual cyst on the lid; that looking at the picture, which is a picture of the little boy who has been the subject of this proceeding, which is Plaintiff's Exhibit I," and directing his attention to the lump which is apparent on the left upper eyelid of this little boy, in his opinion, that is a swelling of his upper lid; that cysts look like that; that in the performance of an operation for the removal of a cyst in the

eyelid of a human being certain instruments are used; that a hemastat is an instrument used by surgeons in any branch of surgery for stopping bleeding, catching hold of blood vessels.

The following then occurred:

"Q. As I understand you to say, a hemastat is an instrument—

"MR. WILLIAMS: If the court please, I don't know exactly what the purpose of this examination is, but I don't see anything in the evidence that would justify the description of instruments, because there is no charge that improper instruments were used or anything of that sort. We have no notice of anything of that sort. There is no charge in the petition of this sort at all.

"MR. RAITHEL: I am laying the foundation, your Honor, of a description of what we expect to show are the proper instruments to use for this operation.

"MR. WILLIAMS: I object to it for the reason that is not a charge in the petition that there were any improper instruments used.

"THE COURT: Sustain the objection.

"MR. RAITHEL: We except."

Witness further testified that in the course of his practice he performed operations for the removal of cysts on the upper eyelid on human beings; that what is usually done in the course of such an operation "depends upon the type of cyst you are going to work on. The commoner type of cyst is either operated on through the skin from the front or by turning back the lid and then operating from behind the lid. There are, of course, other kinds of cysts that are in the skin itself rather than in the partitions of the lid. Now, a cyst of the first type, the commonest type of cyst in the lid, is operated on by most men, at least I was taught that way and that is the way I taught other men to do it, and I believe I can say all the standard text-books advocate that type of operation, if the operation is to be done through the skin, a plate of bone or metal of some kind is slipped under the lid while the operation is being done."

Thereupon the following occurred:

"MR. WILLIAMS: Now, if your Honor please, I move to exclude what the witness has said because he is testifying to matters that are immaterial and irrelevant to any matter charged in the petition. There is only one charge or act of negligence alleged in this petition and that is that in performing this operation the defendants permitted a sharp instrument to come in contract with the eyeball. There is no criticism of the manner in which the operation was performed on the lid. We didn't come here prepared to meet an issue of this sort.

"MR. RAITHEL: If the court please, that is just the thing exactly. I stated it as well as I could that the defendants failed in the performance of said undertaking by negligently and carelessly and unskillfully permitting a sharp instrument with which they were removing said cyst to come in contact with the eyeball of said eye, whereby said eyeball was cut and wounded, causing the sight in said eye to be totally destroyed." If there is anything in the course of this trial to prove the allegations in that petition it is the kind of inquiry that we are now pursuing. He has described and he has laid his authority for it, all the standard text-books, he has been taught, he is teaching men today that for the removal of a cyst on an upper eyelid they use an instrument that has a steel or metal back. That is as far as this witness has gotten in his answer.

"THE COURT: Sustain the objection.

"MR. RAITHEL: We except."

Thereupon the following occurred:

"Q. I will ask you, Doctor, to describe the instruments that are usually used in the performance of an operation for the removal of a cyst in the upper eyelid of a human being?

"MR. WILLIAMS: I object to that because there is no issue made by the petition in this case which would justify the admission of evidence with reference to instruments.

"THE COURT: Sustain the objection.

"MR. RAITHEL: We except.

"Q. I will ask you, Doctor, to state whether or not there are any sharp instruments or instruments with a sharp edge used in the course of the performance of an operation for the removal of a cyst in the upper eyelid of a human being?

".MR. WILLIAMS: I object to that because there is no charge of that sort in the petition.

"THE COURT: Sustain the objection.

"MR. RAITHEL: We except.

"Q. Doctor, I will show you this instrument and ask you if you will be kind enough to state to the court and jury what that instrument is for.

"MR. WILLIAMS: I object to that, if your Honor please; there is nothing in the petition about an instrument.

"THE COURT: Sustain the objection.

"MR. RAITHEL: We except.

"Q. Is the instrument that I have endeavored to have you describe such an instrument as is used in the course or performance of the removal of a cyst from the eyelid of a human being?

"MR. WILLIAMS: I object to that because there is nothing in the petition to suggest it.

"THE COURT: Sustain the objection.

"MR. RAITHEL: Exception. That is what the petition alleges. They don't deny that that instrument was used.

"MR. WILLIAMS: There is no allegation that an improper instrument was used.

"MR. RAITHEL: But a proper instrument may be improperly used, and that is what we are here alleging.

"THE COURT: Why not show him the clerk's penknife and ask him about that?

"MR. RAITHEL: If I didn't know any more about operating upon the human anatomy than that I might try to do that. I asked him whether or not such an instrument was used in the course or performance for the removal of a cyst in the eyelid of a human being.

"THE COURT: You misunderstand me. There is nothing whatever here to connect the instrument such as you have offered here with this operation. I don't know whether that is done with an instrument or a pair of scissors. My recollection is that the witness testified that there was an instrument used in the nature of a pair of scissors. I have ruled on this matter, gentlemen. I am satisfied of the correctness of the ruling.

"MR. RAITHEL: We except to the ruling of the court.

"Q. I will ask you, Doctor, to state whether or not in the course or performance of an operation for the removal of a cyst of the upper eyelid of a human being are any sharp instruments used?

"MR. WILLIAMS: I object to that, if your Honor please, because there is no charge here that there was any improper method used in removing this cyst.

"THE COURT: Sustain the objection.

"MR. RAITHEL: We except. If the court please, I would like to call Mr. Cardinale for the purpose of having him identify these two instruments as ones he saw being used at the time of the performance of this operation by the defendants.

"MR. WILLIAMS: He has been on the stand twice and it seems to me there ought to be some limit to this.

"MR. RAITHEL: That is addressed to the sound discretion of the court.

"THE COURT: Very well; you may recall Mr. Cardinale."

The witness, Augustino Cardinale, on being recalled, said he saw such two instruments in the hand of Dr. McElwee.

Dr. Jacobs, on being recalled, further testified that the instrument shown him, and which had just been identified by the witness, Augustino Cardinale, is known as a scalpel; that a scalpel is an instrument with a sharp edge on it.

The following then occurred:

"Q. What, if you know, is a scalpel used for in the practice of surgery?

"Mr. Williams: I object to that, if your Honor please, as immaterial and having no bearing on any issue made by the petition.

"Mr. Raithel: I just mean the general use of that instrument.

"Mr. Williams: There is no charge in this petition that the instruments were improper instruments and that they used negligently instruments that they should not have used.

"Mr. Raithel: We didn't quite put it that way, but we said they were negligent and unskillful in the performance of the operation, whereby they permitted the sharp edge of an instrument to come in contact with the eyeball of this boy.

"The Court (after further argument): I don't Know what the question is. Will you read it, Mr. Huff? (Reporter reads last question).

"The Court: Sustain the objection.

"Mr. Raithel: Note an exception.

"Q. I will ask you, Doctor, to state whether or not in the course or performance of an operation for the removal of a cyst from the upper eyelid of a human being, a scalpel such as you have identified is used?

"Mr. Williams: I object to that, as there is no allegation in the petition as to that matter.

"The Court: Sustain the objection.

"Mr. Raithel: We except.

"Q. I will ask you to state, Doctor, if you know, about how long it takes to perform an operation for the removal of a cyst from the upper eyelid of an infant male child, eighteen months of age, in normal health?

"Mr. Williams: I object to that, if the court please. There is nothing in the petition that a longer time was taken than required. There is one act of negligence here, and that is that he punctured the eyeball. That is the whole question charged in this case that we came here to answer.

"Mr. Raithel: And we are saving our exception to the ruling of the court in not permitting us to show what

was being done at the time of this alleged unskillful and negligent act on the part of the defendants, from which the jury has a perfect right to infer the negligence. We do not, under the authorities, have to prove that specifically.

"Mr. WILLIAMS: Why, if your Honor please, if they only charged us with taking a longer time to perform the operation, and that had something to do with producing the injury, we should know that. They set forth the specific act we came here to meet.

"Mr. RAITHEL: I hesitate to make myself more plain, but the very purpose of it is to get something for the jury from which they may assume that something out of the ordinary did happen when they operated on the boy that day.

"Mr. WILLIAMS: You can't give the jury facts that would indicate speculation and conjecture.

Mr. RAITHEL: No, no; but until the line of inquiry discloses that it is speculative, I submit under the authorities we have a right, in the absence of direct proof of the act, to submit all the circumstances to this court and jury, from which they have a right to infer negligence which we are unable and which in most cases is unable to be proved directly.

"THE COURT: Sustain the objection.

"Mr. RAITHEL: We except."

Witness further testified that he saw this little boy, Sammy Cardinale, about September, 1920; that he made an examination of him; that he found that the left eyeball of the patient was shrunken and was attached into the upper lid; that the eye, of course, was blind; there was a scar, at which point the eyeball—the remains of the eyeball—was attached to the under surface of the eyelid; that that is an unnatural condition to exist in the human eye; that there was a small scar on the under surface of the upper lid; that the eyeball was down at that point; that is, the two surfaces came in contact and made one scar; that that attachment that he found is an unnatural condition for the human eye to be in.

The following then occurred:

"Q. I will ask you to state, Doctor, from your observation and from your description of what you found there at that time, could such a scar as you saw have been caused by a knife or sharp instrument coming in contact with the eyeball.

"MR. WILLIAMS: If your Honor please, I object to that, because that is the very issue that the jury is here to decide in this case.

"THE COURT: Sustain the objection. I will hear you on that, Mr. Raithel. I cannot imagine how you can be right about it.

"MR. RAITHEL: I wish the court would indicate the reason for the ruling, for this reason, there isn't any possible way known under our proceeding in a case of this sort to describe or assist the court and jury in becoming advised. We have a right to show what the circumstances and conditions were after the alleged negligence. We certainly are not precluded because of the fact that we were not there with an army prepared to make a photo and things of that sort and ocular pictures. That is the very purpose of expert testimony. They are not trying to invade the province of this court and jury; that is not the purpose and it was never so intended. If the matter should go to the jury, your Honor, I am sure you would give an instruction that the jury are not to be bound by the testimony of experts. They are simply to assist the court and jury in determining, as nearly as possible, what the situation is and what caused it, and it is only for that purpose. It is a question as to how much weight it attached to testimony of this sort of witnesses. It certainly is not objectionable. It is a question of weight to be attached to the testimony submitted by witnesses of his character.

"THE COURT: Sustain the objection.

"MR. RAITHEL: I except.

"Q. I will ask you to state to the court and jury, if you know whether or not the injury which produced the

scars that you have testified about was such an injury as might have been inflicted by a blow or a striking?

"Mr. Williams: I object to that, if your Honor please, as invading the province of the jury, not having any tendency to prove that the defendants—

"The Court: Overrule the objection. (Reporter reads the last question.)

"Mr. Williams: I object for the further reason, if your Honor please, he is assuming the injury produced the scars, and this witness evidently doesn't know anything about the matter, because he was not called into the case until September, 1920, eight months afterwards, and it is assuming a fact that has not been proved, and there is no evidence of it whatever in the record whether the injury could have raised these scars.

"Mr. Raithel: I submit, your Honor, he has testified to these scars, testified to and described them, and I believe that in the natural course we are entitled to his opinion.

"The Court: You are entitled to his opinion what could have produced this scar?

"Mr. Williams: Based on evidence. It is proper to ask a medical expert might or could the condition you find here, that injury, have been caused by this fact, namely, this fact in evidence, but there is no evidence here, if your Honor please, that the instrument came in contact. (The reporter, after further argument, repeats the last question.)

"Mr. Williams: That is absolutely irrelevant to any issue in the case.

"The Court: Sustain the objection.

"Mr. Raither: We except.

"Q. In the course of the performance of an operation for the removal of a cyst on the upper eyelid, Doctor, certain instruments are used in the course of that operation, are they not? A. Yes, sir.

"Q. And those are steel instruments, are they not, or metal— A. Metal.

"Q. ——of some kind? A. Yes, sir.

"Q. Doctor, could such a scar as you have described, that you found on the eyeball of Sammy Cardinale, have been produced or caused by a metal coming in contact with the eyeball, a piece of metal?

"MR. WILLIAMS: I object to that, if your Honor please, as there is no evidence of any metal coming in contact with the eyeball, and it would be improper for this witness to give his testimony about that, because that is the issue of fact to be decided by the jury in this case. He doesn't pretend to know anything about the facts concerning the operation, and he is testifying about eight months afterwards, after the child has been in the care of other physicians. For these grounds the point is inadmissible.

"THE COURT: Sustain the objection.

"MR. RAITHEL: We except."

Witness further testified that cutting instruments, a blunt blow, very deep ulcerations are the causes, in his opinion, that produce scars of the character that he has testified about; that these two surfaces which have become adherent would have to be—would have had to be fresh at approximately the same time to become adherent, referring to the adhering of the lower side of the upper eyelid and the eyeball, and on being asked his opinion whether this was produced or was the result of injury simultaneously inflicted upon the eyelid and eyeball, stated, that at the time he examined the eyelid and eyeball of Sammy Cardinale, in September, 1920, the scar was one that had existed for some time, certainly some months; that the eyelid which has been operated on for the removal of a cyst would heal up in a few days unless you reopened them; that under proper care they are healed up within a week certainly; that the eye he is now examining has the same scar, and that it is unusual for an eye to be blind following that kind of an operation.

On cross-examination witness testified that he has had operations for cyst on the eye; that it is not difficult, but is an easy operation; that it is one of the smaller ones; that a good many surgeons do perform that opera-

tion; that this scar that he found in September, 1920, was on the upper border of the cornea, which is the clear part of the eye, that looks like a watch glass, in front of the pupil; that there was a coming together or an adhesion of the eyelid and the cornea at the time he saw it; that he did not attempt to pull it apart; that he saw everything that was in sight; that it was possible that a scar of that sort could be produced by a deep ulceration; that ulcerations are caused by infection, and that is caused by the admission of bacteria into the eye; that bacteria may be admitted into the eye from systemic reasons and also from falling things getting into the eye; and a cinder in the eye will cause bacteria; that bacteria must come in contact with a surface that has been denuded to produce ulceration; that if there is rubbing of the eye or dirt gets into the eye, that can produce bacteria; that that could cause an ulceration; that he examined the eye on the 15th of September; that the father was with the child; that Mr. Rosenfeld introduced him; that he knows nothing about the case before that.

On re-direct examination witness testified that the two surfaces, the inside of the upper eyelid and the eyeball, would have to be raw for them to grow together; that by "denuded surface" he means a surface anywhere on the body where the superficial, that is, the uppermost or outermost, surface has been rubbed off or scratched off or cut off; that an eye affected by a deep-seated ulcer on examination would disclose the presence of that ulcer; and that if an ulcer was apparent it would be observed.

I. In the natural order of things we should first consider the rulings of the court in rejecting evidence offered by the appellant.

The evidence for the appellant showed that several weeks after the operation had been performed the eyeball and the upper eyelid had adhered to each other, had grown together. Counsel for appellant then asked Dr. William E. Shahan, an expert on the eye, if it was a usual or an

*Questions and Rulings.*

unusual occurrence for the eyelid and eyeball to adhere, or grow together, in such cases. To that question, counsel for respondent objected as pure speculation, which objection was sustained and appellant duly excepted.

Counsel for appellant also asked the doctor this question: "From your observation of the condition that existed at that time, are you enabled to tell the jury and the court what, in your opinion, caused that condition that was then existing?" Counsel for respondent objected to said question, because it was a question for the jury to determine in this case, whether or not it was caused by infection of other causes. The court sustained the objection and appellant excepted.

Counsel for appellant also asked the witness this question: "Suppose, Doctor, that during a period of three weeks after the operation to the upper eyelid for the removal of a cyst, there is a growing together or adhesion of the eyeball and eyelid, after such an operation, what, in your opinion, would be the cause of such growing together of the eyeball and the eyelid?" Counsel for respondent objected to the question because it had no reference whatever to the case now before the jury. "He has testified about a growing together many months afterwards. It is speculation and a matter that has nothing to do with any facts or issues in this case." The court sustained the objection and counsel for appellant duly excepted.

Dr. Max W. Jacobs, an expert on the eye, testified that a hemastat was an instrument used by surgeons in any branch of surgery for stopping bleeding, catching hold of blood vessels. The counsel for appellant said: "As I understand you to say, a hemastat is an instrument——

"Mr. Williams: If the court please, I don't know exactly what the purpose of this examination is, but I don't see anything in the evidence that would justify the description of instruments, because there is no charge that improper instruments were used or anything of that

sort. We have no notice of anything of that sort. There is no charge in the petition of this sort at all.

"MR. RAITHEL: I am laying the foundation, your Honor, of a description of what we expect to show are the proper instruments to use for this operation.

"MR. WILLIAMS: I object to it for the reason that is not a charge in the petition that there were any improper instruments used.

"THE COURT: Sustain the objection." Counsel for appellant duly excepted.

Witness further testified that in the course of his practice he performed operations for the removal of cysts on the upper eyelid on human beings; that what is usually done in the course of such an operation "depends upon the type of cyst you are going to work on. The commoner type of cyst is either operated on through the skin from the front or by turning back the lid and then operating from behind the lid. There are, of course, other kinds of cysts that are in the skin itself rather than in the partitions of the lid. Now, a cyst of the first type, the commonest type of cyst in the lid, is operated on by most men, at least I was taught that way and that is the way I taught other men to do it, and I believe I can say all the standard text-books advocate that type of operation, if the operation is to be done through the skin, a plate of bone or metal of some kind is slipped under the lid while the operation is being done."

Counsel for respondent said: "Now, if your Honor please, I move to exclude what the witness has said, because he is testifying to matters that are immaterial and irrelevant to any matter charged in the petition. There is only one charge or act of negligence alleged in this petition, and that is that in performing this operation the defendants permitted a sharp instrument to come in contact with the eyeball. There is no criticism of the manner in which the operation was performed on the lid. We didn't come here prepared to meet an issue of this sort."

Counsel for appellant: "If the court please, that is just the thing exactly. I stated it as well as I could that

they 'failed in the performance of said undertaking by negligently. and carelessly and unskillfully permitting a sharp instrument with which they were removing said cyst to come in contact with the eyeball of said eye, whereby said eyeball was cut and wounded, causing the sight in said eye to be totally destroyed.' If there is anything in my mind in the course of this trial to prove the allegations in that petition it is the kind of inquiry that we are not pursuing. He has described and he has laid his authority for it, all the standard text-books, he has been taught, he is teaching men today, that for the removal of a cyst on an upper eyelid they use an instrument that has a steel or metal back. *That is as far as this witness has gotten in his answer."*

The objection was by the court sustained and counsel for appellant excepted.

Then counsel for appellant asked various witnesses many similar questions to those before stated, all of which have been stated in the statement of the case. These were ruled upon similarly to those above stated, all of which were objected to, and·by the court sustained.

It was shown that a scalpel was one of the instruments that was used by the respondents in removing the cyst. It was shown by Dr. Jacobs that it had a sharp point. The witness was then asked if a scalpel was a proper instrument to be used in the removal of a cyst from the eye, which was objected to and objection sustained, and exceptions saved. Counsel for appellant then asked the witness this question: "I will ask you to state, doctor, from your observation and from your description of what you found there at that time, could such a scar as you saw have been caused by a knife or sharp instrument coming in contact with the eyeball?" This was objected to because that was the question for the jury to find. The objection was sustained.

II. Counsel for appellant insist that all the testimony offered by him, set forth under paragraph one of this opinion, should have been admitted, and that the

court erred in excluding the same, and asks a reversal of
the judgment on that account. It will be ob-

Objections
Sustained:
No Proffer of
Further Proof.

served that counsel for appellant, after the
court sustained said objections, made no of-
fer whatever of what he expected to prove by
the respective witnesses regarding said mat-
ters, or in other words, he did not state to the court what
he expected said witnesses would testify to regarding the
matters, the questions referred to.

Under those conditions of the record we have repeat-
edly held that there was nothing before the court to pass
upon, for the reason we could not tell what the answer
of the witnesses would be, whether for or against the in-
terest of the appellant. If in his favor, in my opinion,
they would have been admissible but if against his in-
terest, of course, there would have been no error had the
court sustained the objections, that is, in so far as the
appellant is concerned.

The correctness of this rule is shown by the latter
part of the evidence introduced which shows that such a
scar as mentioned could have been caused by a knife, or
blunt instrument, or a deep infection, and there is no pre-
tense that the evidence tends to show by which it was
caused.

We are therefore of the opinion that there was no re-
versible error in the rulings of the court in excluding the
evidence.

III. Counsel for appellant next insists that the court
erred in sustaining defendants' demurrer to the evidence
and in giving and reading to the jury defendants' instruc-

Negligence
Inferred.

tion in the nature of a demurrer to the evi-
dence; that there was sufficient evidence from
which an inference of negligence could have
been drawn by the jury, and the following cases are cited
in support thereof: Stratton v. Barnum, 263 S. W. 477;
Peak v. Taubman, 251 Mo. 390; Enloe v. Foundry Co.,
240 Mo. 443; Kelley v. Ross, 165 Mo. App. 475; Ertel v.
Warren, 157 Mo. App. 592; Maginnis v. Mo. Pac. Ry. Co.,

268 Mo. 667; Troll v. Ehrler Dray Co., 162 S. W. 185; Krinard v. Westerman, 216 S. W. 940; Eichholz v. Poe, 217 S. W. 284; Sontag v. Ude, 191 Mo. App. 617; Leeright v. Ahrens, 60 Mo. App. 118; Hague v. Threadgill, 236 S. W. 896; Tate v. Tyzzer, 234 S. W. 1040.

IV.   Counsel for respondent meet the insistence of counsel for appellant as to the evidence making a case for the jury by contending that: ''The sole and only issue of fact in this case was: Did the defendants in performing the operation upon the eyelid, negligently cut the eyeball? It was clearly not proper to prove this fact by opinion evidence. It was not a proper subject of scientific or expert testimony, and the demurrer to the evidence was properly sustained.'' They rely upon these cases in support thereof: McAnany v. Henrici, 238 Mo. 103; O'Leary v. Scullin Steel Co., 260 S. W. (Mo.) 55; Glasgow v. Railway, 191 Mo. 347; Deiner v. Sutermeister, 266 Mo. 505; Castanie v. Railway, 249 Mo. 192; Henson v. Kansas City, 277 Mo. 443; Markel v. Railway, 205 Mo. App. 485.

*Opinion Evidence As Proof.*

In my judgment I have always believed that this contention correctly declares the law of this State, but since the opinion in the case of O'Leary v. Scullin Steel Co., 260 S. W. (Mo.) 1. c. 61, was handed down, it has become a very close question, which will have to be decided by the other members of the court, as I did not agree with the O'Leary case and do not now agree with it, and therefore am of the opinion that the court committed no error in giving the demurrer to the evidence.

V.   I know there was no error in sustaining the demurrer to the evidence, when we consider that there was no offer to show what counsel for appellant expected to prove by the witnesses, regarding the matters excluded by the court, as ruled in the second paragraph of this opinion, for clearly without such evidence or offer, there was no cause made for the jury.

*No Proffer of Proof.*

VI.   I am also of the opinion that whereas the record here shows that the adhesion of the eyelid to the eyeball and the scar on the latter was shown to be eight months after the operation had been performed on the lid,.

**Speculative Causes.** no expert could, with any degree of certainty or even probability, say that it was caused by a sharp-pointed knife, a blunt instrument or deep-seated infection.   Any one of which, all the evidence on the subject showed, could have caused it, which was the common sense of the situation.   The following cases sustain these views: Pate v. Dumbald, 250 S. W. 49; Swearingen v. Railway, 221 Mo. 644; Swartz v. Frank, 183 Mo. 438; Marlow v. Kilgen, 252 S. W. 424; Perkins v. Wilcox, 242 S. W. 974; Weber v. Valier, 242 S. W. 985.

VII.   And I think it is true as contended by counsel for respondents that all expert testimony must be predicated upon facts or conditions conceded to be true, or existing or assumed to be established by other testimony,

**Expert Testimony.** and that necessarily excludes the possibility of basing one opinion upon another opinion.   In this case there was no proof of any sort that there was a cut of the plaintiff's eyeball by the defendant. This fact could not properly be proved by an opinion. To assume it, without any proof, as the producing cause of the condition found, would be to have the experts find the facts and decide the case—on guess work.

The following authorities clearly sustain them: McAnany v. Henrici, 238 Mo. 103; O'Leary v. Scullin Steel Co., 260 S. W. 55; Deiner v. Sutermeister, 266 Mo. 505; Glasgow v. Railway, 191 Mo. 347; Wood v. Railway, 181 Mo. 450; Castanie v. U. Rys. Co., 249 Mo. 192; Henson v. Kansas City, 277 Mo. 443; Taylor v. Metropolitan St. Ry., 256 Mo. 191; McNulty v. Atlas Portland Cement Co., 249 S. W. 730; McAuliff v. U. Rys. Co., 237 S. W. 129; Smart v. Kansas City, 208 Mo. 162; Willis v. Kansas City Term. Ry. Co., 199 S. W. 736; Ruch v. Pryor, 190 S. W. 1037; Jackmann v. Ry. Co., 187 S. W. 786; Mahany v. Railway, 286 Mo. 601; Kinchlaw v. Ry. Co., 264 S. W. 416.

VIII.   The law is well settled that the appellant cannot make out his case by building one inference upon another.   In order for him to prevail on the theory of his counsel it would have to be inferred that the scar found upon the eyeball was caused by a cut, and the further inference that the respondents caused the cut; and still further that the cut caused the loss of the eye.   This cannot be done.  Hays v. Hogan, 273 Mo. 1; Hamilton v. Railway, 250 Mo. 715; Yarnell v. Railway, 113 Mo. 570; Swearingen v. Railway, 221 Mo. 644; Swartz v. Frank, 183 Mo. 438.

*Inference upon Inference.*

For the reasons stated I am clearly of the opinion that the judgment should be affirmed, and it is so ordered.  All concur; *Ragland, P. J.,* in the result; *Atwood, J.,* not sitting.